**ANCHORAGE CITIZENS FOR TAXI REFORM, Appellant,**

v.

**MUNICIPALITY OF ANCHORAGE, and Greg Moyer, Clerk, and Anchorage Taxicab Permit Owners Association, Appellees.**

No. S–11453.

Supreme Court of Alaska.

Dec. 22, 2006.

Rehearing Denied April 12, 2007.

---

Karen Bretz, Anchorage, and Kenneth B. Jacobus, Kenneth P. Jacobus, P.C., Anchorage, for Anchorage Citizens for Taxi Reform.

Mary B. Pinkel, Assistant Municipal Attorney, and Frederick H. Boness, Municipal Attorney, Anchorage, for Municipality of Anchorage.

James T. Brennan, Hedland, Brennan & Heideman, Anchorage, for Anchorage Taxicab Permit Owners Association.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Article XI, section 7 of the Alaska Constitution prohibits using an initiative to make an "appropriation." Anchorage Citizens for Taxi Reform (Anchorage Citizens) submitted to the Municipality of Anchorage a petition for an initiative requiring the city to issue a taxi permit to any qualified person paying an administrative fee. The municipal clerk rejected the petition, reasoning that the initiative would make an appropriation, in violation of article XI, section 7. When Anchorage Citizens filed suit, the superior court granted summary judgment to the municipality. We reverse. Because taxicab permits are not public assets, we hold that the proposed initiative would not make an "appropriation." We also hold that the initiative is not stale.

### II. FACTS AND PROCEEDINGS

In February 2002 Anchorage Citizens filed a petition for ballot initiative entitled "Initiative Petition 2002 Taxi, Limousine and Vehicle for Hire Reformation Act" with the Municipality of Anchorage's municipal clerk. The initiative would require the municipality to issue taxicab permits to any qualified ap-

plicant paying an administrative fee.[1] Anchorage Citizens intended the initiative to be placed on the ballot in the next municipal election, in April 2002. The municipal clerk refused to certify the petition based on advice from the municipal attorney. The municipal attorney warned that the proposed initiative would require the municipality to pay just compensation to avoid constitutional takings claims from current taxi permit holders and would thereby impermissibly mandate an appropriation of municipal funds.

Anchorage Citizens filed a complaint in superior court seeking a declaration that the municipality and clerk Greg Moyer erred by refusing to certify the initiative and an order placing the initiative on the next municipal ballot. The Anchorage Taxicab Permit Owners Association (Owners Association) filed a motion to intervene, and the superior court granted the motion. Anchorage Citizens and the Owners Association both moved for summary judgment, and the municipality joined the Owners Association's motion.

In March 2003 the superior court granted summary judgment to the municipality and the Owners Association. The court concluded that the initiative would result in an appropriation of public assets, for two reasons: first, the initiative would cause an "unconstitutional taking" that would require an appropriation by the Anchorage Assembly to pay "just compensation"; and second, the initiative would give away municipally controlled

resources, the permits themselves. After entry of final judgment, the court clerk ordered Anchorage Citizens to pay the Owners Association's litigation costs in the amount of $3,292.39. The Owners Association then moved for attorney's fees. The superior court denied the motion, finding that Anchorage Citizens was a public interest litigant, but affirmed the award of costs against Anchorage Citizens.

Anchorage Citizens appeals the court's grant of summary judgment to the municipality and the cost order. The Owners Association and the municipality argue that even if the initiative is constitutionally valid, the initiative is stale. The Owners Association also argues that relief should be denied under the doctrine of laches.

## III. DISCUSSION

■■■ Anchorage Citizens contends that the superior court erred in concluding that the initiative would make an appropriation. Anchorage Citizens argues that taxicab permits are not "public assets" that would be appropriated by the initiative. Anchorage Citizens also argues that this court does not need to decide whether the permits are property the taking of which would require just compensation. As to the latter argument, any constitutional takings discussion here would be premature and could unduly affect the initiative process.[2] Thus, the main ques-

---

1. The initiative states, in relevant part:

 **The Proposition:** Shall the charter be amended to add the following sections to Article XVII:
 **Section 17.14 Regulated vehicle permits**
 The Municipality shall issue a non-transferable general taxicab permit to any qualified applicant. The fees paid for issuance or annual renewal of taxicab, limousine, or vehicle for hire permits shall be uniform. Issuance or annual renewal fees required for any of the aforementioned permits shall be equivalent and set to cover real administrative costs of issuing and filing them only and not set so as to be a substantial barrier to entry. The exception to this act shall be that no fees shall be levied on taxicab permits for vehicles that are fully wheelchair accessible.
 **Section 17.15 Regulated vehicle rates and terms of service**
 The Municipality is hereby prohibited from establishing rates for limousine or executive

 sedan service. Any vehicle dispatch service licensed by the Municipality shall be allowed to dispatch any vehicle.

2. We therefore do not decide here whether taxicab permits are private property the taking of which requires just compensation, nor do we decide whether the initiative would result in any such taking. Our limited review is consistent with the principle that an initiative may be reviewed before going to the voters only to "ensure compliance with 'the particular constitutional and statutory provisions regulating initiatives.'" *State v. Trust the People*, 113 P.3d 613, 626 (Alaska 2005) (quoting *Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 992 (Alaska 2004)). The municipal clerk may not reject the measure on other constitutional grounds unless "'controlling authority' leaves no room for argument about its unconstitutionality." *Alaska Action Ctr.*, 84 P.3d at 992 (quoting *Brooks v. Wright*, 971 P.2d 1025, 1027 (Alaska 1999)). No such ground is present here. *See id.*

tion for us on appeal is whether the initiative proposal would make an appropriation, a question that turns on whether the taxicab permits are public assets.

### A. Standard of Review

■ We review a superior court's grant of summary judgment de novo and affirm if the moving party is entitled to judgment as a matter of law.[3] We draw all factual inferences in favor of, and view the facts in the light most favorable to, the non-prevailing party.[4] We review questions of law, including the constitutionality of a ballot initiative, using our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[5] In matters involving initiatives, we "construe voter initiatives broadly so as to preserve them whenever possible. However, initiatives touching upon the allocation of public revenues and assets require careful consideration because the constitutional right of direct legislation is limited by the Alaska Constitution." [6]

**3.** *McCormick v. Reliance Ins. Co.,* 46 P.3d 1009, 1011 (Alaska 2002).

**4.** *Rockstad v. Erikson,* 113 P.3d 1215, 1219 (Alaska 2005).

**5.** *Pullen v. Ulmer,* 923 P.2d 54, 58 (Alaska 1996).

**6.** *Id.* (quoting *City of Fairbanks v. Fairbanks Convention & Visitors Bureau,* 818 P.2d 1153, 1155 (Alaska 1991)).

**7.** *See Alaska Civil Liberties Union v. State,* 122 P.3d 781, 785 (Alaska 2005).

**8.** *Thomas v. Bailey,* 595 P.2d 1, 3 (Alaska 1979).

**9.** Alaska Const. art. XI, § 1.

**10.** *See also* AS 15.45.010; Anchorage Municipal Charter § 3.02(a).

**11.** *Pullen,* 923 P.2d at 58.

**12.** *Alaska Action Ctr.,* 84 P.3d at 993 (making clear that prohibition on appropriation by initiative encompasses land and then considering whether initiative would appropriate that land); *Pullen,* 923 P.2d at 58, 61 (considering whether salmon are public assets and then considering whether initiative would appropriate that public asset); *Alaska Conservative Political Action Comm. v. Municipality of Anchorage,* 745 P.2d 936, 938 (Alaska 1987) (noting that public utility

■ Whether the superior court made an error in awarding costs against a public interest litigant is a legal question. We review legal questions using our independent judgment.[7]

### B. The Initiative Would Not Appropriate Municipal Assets.

■ Article XI, section 1 of the Alaska Constitution gives Alaskans the right of direct legislation.[8] Section 1 states: "The people may propose and enact laws by the initiative, and approve or reject acts of the legislature by the referendum." [9] The initiative power is limited, however, by article XI, section 7, which provides that "[t]he initiative shall not be used to . . . make or repeal appropriations." [10] That provision prohibits initiatives that would give away public assets.[11] We use a two-part inquiry to determine whether a particular initiative makes an appropriation.[12] First, we determine whether the initiative deals with a public asset.[13] In a series of cases, we have determined that public revenue,[14] land,[15] a municipally-owned utility,[16] and wild salmon [17] are

is significant municipal asset and that initiative that would require municipality to transfer utility for one dollar would be appropriation of that asset).

**13.** *Pullen,* 923 P.2d at 58–61.

**14.** *See Thomas v. Rosen,* 569 P.2d 793, 796 (Alaska 1977) (endorsing definition of "appropriation" that involved setting aside of "public revenue"). Although *Rosen* presented the question whether a voter-approved bonding proposition was an appropriation bill within the meaning of article II, section 15 of the Alaska Constitution, we have consistently cited to *Rosen* when noting that public revenue or money cannot be appropriated by initiative. *See Pullen,* 923 P.2d at 58; *Bailey,* 595 P.2d at 6 n. 21.

**15.** *See Bailey,* 595 P.2d at 4–9 (state land may not be appropriated by initiative); *see also Alaska Action Ctr.,* 84 P.3d at 993–95 (same); *McAlpine v. Univ. of Alaska,* 762 P.2d 81, 90–91 (Alaska 1988) (holding one part of initiative that would have transferred land from University of Alaska to new community college an invalid appropriation).

**16.** *See Alaska Conservative Political Action Comm.,* 745 P.2d at 938 ("A utility with $32.7 million equity is a significant municipal asset.").

all public assets that cannot be appropriated by initiative. Second, we determine whether the initiative would appropriate that asset.[18] In deciding whether the initiative would have that effect, we have looked to the "two core objectives" of the limitation on the use of the initiative power to make appropriations.[19] One objective is preventing "giveaway programs" that appeal to the self-interest of voters and endanger the state treasury.[20] The constitutional delegates were concerned that "[i]nitiatives for the purpose of requiring appropriations [would] pose a special danger of 'rash, discriminatory, and irresponsible acts.' "[21] The other objective is preserving legislative discretion by "ensur[ing] that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs."[22]

 Three classes of taxicab permits currently exist in Anchorage: " 'transferable general' taxicab permits,' 'limited taxicab permits,' and 'non-transferable taxicab permits.' "[23] Transferable general permits may be transferred, leased, sold, or encumbered with security interests with the approval of the Anchorage Transportation Commission (commission).[24] There are currently 158 transferable general permits. These permits have recently been valued for as much as $125,000 each. Limited and non-transferable permits may not be sold.[25] The municipal code provides that the commission must issue additional limited or non-transferable permits if "public convenience and necessity would be best served by the issuance of one or more additional . . . permits."[26] The municipality claims, and Anchorage Citizens does not contest, that since 1994, the municipality has issued four non-transferable permits and no limited permits. The non-transferable permits were issued at public auction; each one sold for an amount between approximately $30,000 to $45,000.

The municipality argues that taxicab permits are "municipally controlled resources and thus public assets." It analogizes this initiative to the one we deemed unconstitutional in *Pullen v. Ulmer*,[27] and suggests that the revenue-raising aspect of the taxicab permitting system makes the permits themselves municipal assets. The municipality does not, however, argue that an initiative that affects the municipality's *power to permit* would be an appropriation.[28] We therefore only consider whether the permits themselves—at the moment they are transferred

---

17. *See Pullen*, 923 P.2d at 61.

18. *Id.*

19. *Id.* at 63; *see also City of Fairbanks*, 818 P.2d at 1156 (noting that our cases focus on "two parallel purposes for preventing the making of appropriations through the initiative process").

20. *See Pullen*, 923 P.2d at 62–63; *see also Alaska Action Ctr.*, 84 P.3d at 993–94; *City of Fairbanks*, 818 P.2d at 1156.

21. *Bailey*, 595 P.2d at 7 (quoting V. Fisher, Alaska's Constitutional Convention 80–81 (1975)).

22. *McAlpine*, 762 P.2d at 88 (emphasis in original); *see also Alaska Action Ctr.*, 84 P.3d at 994; *City of Fairbanks*, 818 P.2d at 1156.

23. Anchorage Municipal Code (AMC) 11.20.016. Transferable general permits were issued before February 22, 1994 and limited and non-transferable permits have been issued since February 22, 1994. The municipality can no longer issue transferable general permits. *See* AMC 11.20.040(B).

24. AMC 11.20.040.

25. AMC 11.20.035(C); AMC 11.20.037(C). Limited permits restrict usage to a specific time or a specific geographic area determined by the commission. AMC 11.20.035(A). Limited and non-transferable permits are restricted to drivers who are both owners and operators of the taxicab under the permit. AMC 11.20.035(D); AMC 11.20.037(D).

26. AMC 11.20.030. In making that determination, the commission may consider, among other things, the public demand for additional taxi service, the unfulfilled requests for service, the reasonableness of waiting time for service, the economic impact of additional permits on the viability of the existing taxi industry, and the type of permit which would meet the demand for additional service. AMC 11.20.030(B).

27. *Pullen v. Ulmer*, 923 P.2d 54 (Alaska 1996).

28. At oral argument before us, Anchorage Citizens argued that the "right to issue taxicab permits" is an exercise of the municipality's police power, not a public asset subject to appropriation.

from the municipality to the permit holders—are public assets.

In *Pullen*, we considered a proposed initiative that would have given subsistence, personal use, and sport fisheries priority over commercial fisheries to harvest salmon.[29] We held that the initiative would make an appropriation because (a) salmon are public assets; and (b) the initiative reduced the government's discretion over the fisheries and appealed to the self-interest of sport, personal, and subsistence fishers.[30] Although we noted that the state does not "own" salmon in the same way it owns land or other assets, we advanced two reasons why salmon are nonetheless public assets.[31] First, the state benefits financially from the collection of taxes imposed on businesses involved in the fishing industry and from license fees imposed on sport, personal use, and commercial fishers.[32] Alaska's economy and revenue base depend on the health of the salmon fisheries.[33] And second, we noted that the public trust responsibility, imposed by article VIII of the Alaska Constitution, to take care of fish, wildlife, and water resources of the state, gives the state "property-like interests" in salmon.[34] We concluded that "naturally occurring salmon are, like other state natural resources, state assets belonging to the state which controls them for the benefit of all its people."[35]

Taxicab permits are not public assets. Unlike a license to fish, or a permit to extract mineral resources, a taxicab permit does not authorize the holder to take a public resource. The underlying things of value—the fares to be paid by taxicab riders—do not belong to the municipality. Moreover, it appears that taxicab permits are not issued to raise money for the municipality, but to serve a regulatory function. The code states that "public convenience and necessity" shall determine whether the municipality should issue additional permits.[36] The fact that the municipality has issued only four permits since 1994 confirms that the permits are issued primarily as a public welfare and safety measure, not for revenue-raising purposes. Even though the purchasers of the four permits at auction paid as much as $45,000 for a permit, the total amount raised by selling the four permits is not significant. We assume that if the municipality intended revenue to be a major purpose for issuing taxicab permits, it would have sold more than four permits since 1994. Because issuing the permits served a regulatory rather than a revenue-raising function, and because the municipality does not own the underlying resource the permits authorize holders to take, we conclude that taxicab permits are not public assets.[37]

## C. The Initiative Is Not Stale.

■ The municipality and the Owners Association argue that because so much time has passed since the petition was initially signed, the signers of the petition are no longer "qualified voters" as required by the charter. The charter requires that an initiative petition "be signed by a number of qualified voters equal to at least ten percent of the voters who cast ballots at the last regular mayoral election."[38] An initiative must be "submitted to the voters at the next regular election held at least 45 days after certification of the petition."[39] The code defines "qualified voter" as one who "at the moment he signs a petition for initiative or referendum, is legally entitled to vote and who, by virtue of a current, valid residence address, is registered to vote in state and Anchorage

29. *Pullen*, 923 P.2d at 55.

30. *Id.* at 61, 63.

31. *Id.* at 59–61.

32. *Id.* at 59.

33. *Id.*

34. *Id.* at 60–61.

35. *Id.* at 61.

36. AMC 11.20.030.

37. Because we hold that taxicab permits are not public assets, we do not need to consider whether the initiative would appropriate the permits.

38. Anchorage Municipal Charter § 3.02(a).

39. Anchorage Municipal Charter § 3.02(b).

municipal elections." [40] The municipality and the Owners Association assert that many of the signers have since moved out of state or had their registration lapse such that there is no longer a congruence between the petition pool and the electorate.[41]

We agree with the municipality that the municipal code expresses the intent that "the voters who have signed a petition are, *to the extent possible,* the same voters who will vote on it." (Emphasis added.) But this proposition does not require exact congruence between the signers and the registered voters. And the Owners Association has failed to show that any substantial discrepancy actually exists. Only four years have passed since the clerk refused to certify the initiative. And Anchorage Citizens has been seeking relief during this time period, as expressly allowed in the municipal code, through the judicial system.[42]

Moreover, we have previously explained that "[b]ecause the Alaska Constitution preserves the people's power to propose and enact laws through initiatives, . . . courts must give statutory and constitutional regulations of initiatives liberal, broad readings." [43] Municipal law sets out two relevant requirements: (1) an initiative in Anchorage must be signed by persons who are eligible to vote and currently registered "*at the moment [they] sign* [ ] the petition;" [44] and (2) the petition must be "submitted to the voters at the next regular election held at least 45 days after certification." [45] The first requirement is squarely met because it seems undisputed that the initiative's signers were eligible and registered "at the moment they

signed." And the deadline for meeting the second requirement has not arrived, since the municipality has not yet certified the initiative. When the municipality does so on remand and submits the initiative to the voters for the next regular election, the municipality's "qualified voter" requirements will be strictly met.

The municipality and the Owners Association also urge us to adopt the position taken by the California Supreme Court in *Gage v. Jordan,* which held that an initiative measure that failed because it lacked the requisite number of signatures could not be automatically revitalized two years later by a subsequent decrease in the number of signatures required for certification.[46] But *Gage* is distinguishable because the initiative sponsors here did not let the petition "lay dormant" as the petitioners did in *Gage.*[47] Instead, Anchorage Citizens timely sought certification of its petition for initiative and upon the clerk's rejection, promptly filed a complaint in superior court. We therefore conclude that the initiative is not stale.

■ We also reject the Owners Association's laches argument. Laches operates to bar a claim when a court finds one party caused unreasonable delay in seeking relief that resulted in prejudice to the other party.[48] A review of the record reveals that all three of the parties filed, and were granted, numerous requests for extensions of time with the superior court. And contrary to the Owners Association's suggestion, Anchorage Citizens, as the losing party below, had no obligation to seek a final, appealable judg-

---

**40.** AMC 2.50.010.

**41.** The Owners Association also suggests that the ten percent requirement might not be met any longer if there were more voters in the April 2003 election than in the 2000 election.

**42.** The code provides that the clerk's decision may be appealed to the superior court. AMC 2.50.030(C).

**43.** *Kodiak Island Borough v. Mahoney,* 71 P.3d 896, 899 (Alaska 2003); *see also Pullen,* 923 P.2d at 58; *Yute Air Alaska, Inc. v. McAlpine,* 698 P.2d 1173, 1181 (Alaska 1985) ("[A]ll doubts as to all technical deficiencies or failure to comply with the exact letter of procedure will be resolved in

favor of [preserving the initiative].") (quoting *Boucher v. Engstrom,* 528 P.2d 456, 462 (Alaska 1974)).

**44.** Municipal Charter § 3.02(a) and AMC 2.50.010 (emphasis added).

**45.** Municipal Charter § 3.02(b).

**46.** *Gage v. Jordan,* 23 Cal.2d 794, 147 P.2d 387, 394 (1944).

**47.** *See id.* at 389.

**48.** *State, Dep't of Commerce & Econ. Dev., Div. of Ins. v. Schnell,* 8 P.3d 351, 358–59 (Alaska 2000).

ment.[49] Anchorage Citizens did not cause any unreasonable delay that would have warranted a dismissal of its claim under laches.[50]

### D. Costs May Not Be Awarded Against Anchorage Citizens.

■ The superior court found that Anchorage Citizens is a public interest litigant but affirmed the court clerk's award of litigation costs to the Owners Association against Anchorage Citizens. Anchorage Citizens argues that it was error to award costs against it. The municipality and the Owners Association do not contest the superior court's decision concerning Anchorage Citizens's public interest litigant status, nor do they address whether the superior court permissibly awarded costs to the Owners Association after it found that Anchorage Citizens is a public interest litigant. Because we reverse the judgment below, the Owners Association is no longer the prevailing party. We therefore vacate the cost award. We note, however, that public interest litigants do not have to pay the opposing party's costs or attorney's fees.[51] Because it is undisputed that Anchorage Citizens is a public interest litigant, litigation costs should not have been awarded against it even when it was not the prevailing party in the superior court.

Because it is now the prevailing party, Anchorage Citizens may seek prevailing party fees and costs on remand.

## IV. CONCLUSION

Because the taxicab initiative does not violate the article XI, section 7 limitation on appropriation by initiative, we REVERSE the judgment below. We also VACATE the award of costs against Anchorage Citizens. We REMAND for entry of an amended judgment ordering the municipality to certify the initiative and present it to the voters at the next municipal election.

CARPENETI, Justice, dissenting.

CARPENETI, J., dissenting.

I dissent from today's opinion because I believe it mischaracterizes the nature of the asset at issue in this case and therefore misapplies our case law on appropriative initiatives, especially our decision in *Pullen v. Ulmer.*[1] Taxicab permits allow commercial operators to use a costly and important public resource—the public roads—for private gain. As such, they give direct access to a valuable and limited public resource to those who receive them. This situation is legally indistinguishable from the permits at issue in *Pullen.* Our decision in that case should control the outcome here.

In *Pullen* we invalidated an initiative that would have directed the state to favor noncommercial over commercial users of salmon in issuing fishing permits. We acknowledged that "the state does not own wildlife in precisely the same way that it owns ordinary property" but we characterized the true question as being "whether the state's interest in wildlife is such that it can appropriately be characterized as state property subject to appropriation."[2] We found that it was, noting that a precipitous decline in wildlife would affect the state in a "significant" manner.[3] Just as the people of Alaska have an interest in fairly allocating the limited wildlife resources of our state, so do the people of Anchorage have an interest in fairly allocat-

---

**49.** *See* Alaska R. Civ. P. 78(a) ("Unless otherwise ordered by the court, counsel for the *successful* party to an action or proceeding shall prepare in writing and file and serve on each of the other parties proposed findings of fact, conclusions of law, judgments and orders.") (emphasis added). The Owners Association suggests that Anchorage Citizens delayed the proceedings by not seeking a final appealable judgment in time for the April 2003 elections.

**50.** The Owners Association's argument regarding prejudice also fails. It states that the delay since the municipality rejected the initiative "would prejudice Anchorage municipal voters." But this assertion is conclusory; and it is also factually unsupported and not self-evident. The Owners Association also reiterates the staleness argument that we rejected above.

**51.** *Matanuska–Susitna Borough Sch. Dist. v. State,* 931 P.2d 391, 404 (Alaska 1997); *Griswold v. City of Homer,* 925 P.2d 1015, 1017, 1030–31 (Alaska 1996).

**1.** 923 P.2d 54 (Alaska 1996).

**2.** *Id.* at 59.

**3.** *Id.*

ing the use of limited and publicly funded roadways for commercial purposes.

Today's opinion distinguishes *Pullen* on the basis that "[u]nlike a license to fish, or a permit to extract mineral resources, a taxicab permit does not authorize the holder to take a public resource. The underlying things of value—the fares to be paid by taxicab riders—do not belong to the municipality." But the thing of value here is not the right to collect fares—it is the right to use the *public* roads, a costly and important public resource, for commercial purposes, here including the solicitation of business.[4] A taxicab permit holder has been given a specific franchise which is no less an asset than is a license to catch fish.[5]

Today's opinion also argues that the initiative cannot constitute an appropriation because "taxicab permits are not issued to raise money for the municipality, but to serve a regulatory function." This conclusion creates a false dichotomy. Both purposes are present, as evidenced by the Anchorage Municipal Code's treatment of taxicab permits. The code requires the municipality to consider "public convenience and necessity" in the granting of permits,[6] and it requires that new permits be sold at "public auction"[7] to the "highest qualified bidder."[8] Consideration of the public convenience and necessity serves the regulatory function, while the requirements that the permits be sold at public

auction to the highest bidder serve the revenue-raising function. Moreover, $45,000 per permit is a significant amount of money and the total amount raised through sales of permits—approximately $160,000[9]—cannot accurately be characterized, as today's opinion does, as "not significant." We have previously characterized lesser amounts as "significant"[10] and "substantial.[11]" That the municipality has issued only a limited number since 1994 does not suggest, as today's opinion "assume[s]," that revenue-raising is not a purpose of the code; rather, it suggests that the municipality has carefully balanced two non-exclusive purposes, regulation and revenue-raising.

Finally, today's opinion authorizes a "give-away program" no less than the initiatives found unconstitutional in *Pullen* and *Alaska Action Center.*[12] Rather than limiting the number of licenses as required by the public convenience and necessity, the initiative requires that a license be issued "to any qualified applicant."[13] And, rather than requiring that the license go to "the highest qualified bidder"[14] at "public auction,"[15] the proposed initiative would require that the license fee be limited to administrative costs,[16] approximately $825, rather than the market value of approximately $45,000.

---

**4.** *Cf. In re Hathorn's Transp. Co.,* 121 Vt. 349, 158 A.2d 464, 467 (1960) (motor carrier certificate "is a franchise, and is a property right").

**5.** In *Pullen* we noted that the state does not own fish but has "property-like interests" in them. 923 P.2d at 60–61. The municipality does own the public roads, and thus the case for allowing appropriation of part of this property via initiative is even weaker than it was in *Pullen.*

**6.** AMC 11.20.030(C).

**7.** AMC 11.20.030(D).

**8.** AMC 11.20.030(D)(1).

**9.** This figure represents only the value of assets that in the future may be lost to the public under the initiative. This dissent does not touch on the far greater loss of value that may befall the private sector; that is, current permit holders. According to an affidavit filed by James B. Taylor, an officer of the Anchorage Taxicab Permit Owners' Association, there are 160 transferable

general taxicab permits in Anchorage, each with a market value of $125,000 per permit.

**10.** *Murphy v. City of Wrangell,* 763 P.2d 229, 233 (Alaska 1988) (possible judgment against city for $25,000 or greater represented a "significant amount of money").

**11.** *See Fairbanks Fire Fighters Ass'n v. City of Fairbanks,* 934 P.2d 759, 763 n. 11 (Alaska 1997) ($4000 per week was "a substantial amount of money").

**12.** *Alaska Action Ctr., Inc. v. Municipality of Anchorage,* 84 P.3d 989, 993–94 (Alaska 2004).

**13.** Initiative, § 17.14.

**14.** AMC 11.20.030(D)(1).

**15.** AMC 11.20.030(D).

**16.** Initiative, § 17.14.

As we held in *Staudenmaier v. Municipality of Anchorage,*[17] a forced sale of a municipal asset—even at market value—is an appropriation of that asset. Here, the forced sale—for $825—of an asset for which the municipality could garner as much as $45,000 at auction is equivalent to a give-away of the asset. Because the initiative would "designate how the Anchorage Assembly is to make use of municipal assets,"[18] it would effect an appropriation. For these reasons I would affirm the judgment of the superior court.

---

**17.** 139 P.3d 1259, 1262 (Alaska 2006). *See also Alaska Conservative Political Action Comm. v. Municipality of Anchorage,* 745 P.2d 936 (Alaska 1987) (forced sale of municipal asset at below-market value constitutes appropriation).

**18.** *Staudenmaier,* 139 P.3d at 1263 n. 23.