*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| LIEUTENANT GOVERNOR OF THE STATE OF ALASKA, | ) ) ) | Supreme Court No. S-15662 |
| Appellant, | ) ) | Superior Court No. 3AN-14-04558 CI |
| v. | ) ) | O P I N I O N |
| ALASKA FISHERIES CONSERVATION ALLIANCE, INC., | ) ) ) | No. 7073 – December 31, 2015 |
| Appellee. | ) ) ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Catherine M. Easter, Judge.

Appearances: Joanne M. Grace and Elizabeth M. Bakalar, Assistant Attorneys General, Anchorage, and Craig W. Richards, Attorney General, Juneau, for Appellant. Matthew Singer, Holland & Knight LLP, Anchorage, Susan Orlansky, Reeves Amodio LLC, Anchorage, and Jeffrey M. Feldman, Summit Law Group, Seattle, Washington for Appellee. William D. Falsey, Sedor Wendlandt Evans & Filippi, LLC, Anchorage, for Amicus Curiae Resources for All Alaskans, Inc.

Before: Stowers, Chief Justice, Winfree, Maassen, and Bolger, Justices. [Fabe, Justice, not participating.]

BOLGER, Justice.

## I. INTRODUCTION

The Lieutenant Governor declined to certify a proposed ballot initiative that would ban commercial set net fishing in nonsubsistence areas, reasoning that the initiative was a constitutionally prohibited appropriation of public assets. But the superior court approved the initiative, concluding that set netters were not a distinct commercial user group and that the legislature and Board of Fisheries would retain discretion to allocate the salmon stock to other commercial fisheries. In this appeal, we conclude that set netters are a distinct commercial user group that deserves recognition in the context of the constitutional prohibition on appropriations. We therefore reverse the superior court's judgment because this proposed ballot initiative would completely appropriate salmon away from set netters and prohibit the legislature from allocating any salmon to that user group.

## II. FACTS AND PROCEEDINGS

### A. Facts

The directors of Alaska Fisheries Conservation Alliance, Inc. (the sponsors), a nonprofit organization with the stated goal of "protect[ing] fish species that are threatened by over-fishing, bycatch[,] or other dangers," sponsored a proposed statewide ballot initiative, 13PCAF, to prohibit the use of commercial set nets in nonsubsistence areas.[1] In its statement of findings and intent, 13PCAF declares that "set net fishing is an antiquated method of harvesting fish that indiscriminately kills or injures large numbers of non-target species," making the practice "wasteful of fisheries

---

[1]    "A nonsubsistence area is an area or community where dependence upon subsistence is not a principal characteristic of the economy, culture, and way of life of the area or community." AS 16.05.258(c); *see also* AS 16.05.258(c)(1)-(13) (listing the specific characteristics the Boards of Fisheries and Game must consider when designating subsistence and nonsubsistence areas).

resources." To address this stated concern, the executing portion of the proposed initiative provides:

> Article 6 of AS 16.05 is amended by adding a new section . . . to read:
>
> **16.05.781. Set gillnetting in nonsubsistence areas prohibited.**
>
> (a)    Except for customary and traditional use or for personal use fishing, a person may not use a shore gill net or set net to take fish in any nonsubsistence area. This section shall control over any other provision to the contrary.
>
> (b)    For purposes of this section, "customary and traditional" has the meaning used in AS 16.05.940(7), "personal use fishing" has the meaning as used in AS 16.05.940(26), "shore gill net" and "set net" have the meaning as used in AS 38.05.082[,] and "nonsubsistence area" has the meaning as used in AS 16.05.258(c).
>
> (c)    Nothing in this section shall affect the use of shore gill nets and set nets to take fish in subsistence areas.
>
> (d)    Nothing in this section shall be construed as a limitation on the legislature's or the Board of Fisheries' discretion to allocate fish among competing users.

The Department of Law reviewed the initiative application and concluded that 13PCAF met three of the four statutory requirements for certification: the proposed initiative was confined to a single subject, the subject was expressed in the title, and its enacting clause contained the proper introductory phrase.[2] But the Department concluded that 13PCAF effected an appropriation and was therefore an invalid subject

---

[2]    *See* AS 15.45.040(1)-(3) (setting requirements for form of proposed initiatives).

for an initiative under article XI, section 7 of the Alaska Constitution.[3] Citing *Pullen v. Ulmer*,[4] the Department concluded that 13PCAF violated the core objectives of the prohibition against appropriative initiatives because it would transfer salmon to a majority user group — sport and personal use fishers — at the expense of a minority user group — commercial set netters — and would reduce the legislature's and Board of Fisheries' control over allocation decisions regarding salmon.

Relying on the Department of Law's analysis, the Lieutenant Governor declined to certify 13PCAF.[5]

## B.     Proceedings

After the Lieutenant Governor declined to certify the initiative, the sponsors filed a complaint for declaratory judgment and injunctive relief, asking the superior court to order the Lieutenant Governor to certify 13PCAF. The sponsors argued that the proposed initiative would not appropriate state assets but was instead an attempt to "regulat[e] the methods and means for the take of wildlife" that "leaves all allocation decisions to the discretion of the legislature and the Board of Fish[eries]."

---

[3]      "The initiative shall not be used to . . . make or repeal appropriations." Alaska Const. art. XI, § 7. *See also* AS 15.45.040(4) (prohibiting initiatives from "includ[ing] subjects restricted by AS 15.45.010," which mirrors the subjects — including appropriations — listed in article XI, section 7 of the Alaska Constitution).

[4]      923 P.2d 54, 64-65 (Alaska 1996) (holding that a proposed initiative giving preferential treatment to subsistence, personal use, and sport fisheries at the expense of commercial fisheries would effect an appropriation).

[5]      Certification is the first step in the initiative process. If an initiative is not certified, it will not appear on the ballot. *See* AS 15.45.090 (requiring lieutenant governor to circulate petitions if initiative is certified); AS 15.45.180, .190 (requiring lieutenant governor to place initiative on ballot if petition is properly filed).

The sponsors and the Lieutenant Governor filed cross-motions for summary judgment. The sponsors argued that "[v]oter initiatives must be construed broadly so as to preserve them whenever possible," that Alaskans have historically regulated the methods and means for taking fish and wildlife by initiative, and that 13PCAF would "merely regulate[] the use of one gear type" while placing no restrictions on the Board of Fisheries' ability to allocate fish between commercial, sport, guided sport, and personal uses. In his motion for summary judgment, the Lieutenant Governor contended that 13PCAF effected an appropriation because it was "designed to appeal to the self-interests of a majority user group — sport and personal use fishers — by effectively transferring salmon from a much smaller minority of commercial users." The Lieutenant Governor also argued that 13PCAF would "significantly reduce[] the legislature's and Board of Fisheries' control of and discretion over allocation decisions" by preventing them from allocating salmon stock to commercial set netters.

The superior court granted summary judgment in favor of the sponsors, concluding that 13PCAF would not effect a prohibited appropriation. Rejecting the Lieutenant Governor's claims, the court concluded that 13PCAF was not a give-away program because it "would not target any particular group to receive salmon or result in the voters voting themselves salmon." And the court concluded that 13PCAF did not narrow the legislature's and Board of Fisheries' range of freedom in making allocation decisions because the Board "would be free to continue to allocate the salmon presently harvested by commercial set net fishers to other commercial fisheries . . . [or] authorize new gear types for commercial fishermen." The court therefore concluded that 13PCAF, if passed, would be a permissible regulatory measure, and the court ordered the Lieutenant Governor to certify the proposed initiative.

The Lieutenant Governor appeals. Resources for All Alaskans, Inc., an organization representing the interests of commercial fishers, filed an amicus brief

supporting the Lieutenant Governor's position and additionally arguing that 13PCAF would enact impermissible local or special legislation.[6]

## III. STANDARD OF REVIEW

"We review a superior court's decision on summary judgment de novo, drawing all inferences in favor of, and viewing the facts in the record in the light most favorable to, the non-moving party."[7]  "We review questions of law, including the constitutionality of a ballot initiative, using our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy."[8]  "The interpretation of the constitutional term 'appropriation' is a question of law to which we apply our independent judgment."[9]

## IV. DISCUSSION

### A. 13PCAF Would Effect A Prohibited Appropriation.

The Lieutenant Governor argues that the superior court erred by ordering him to certify 13PCAF.  He renews his claim that the proposed initiative would effect a prohibited appropriation.

Article XI, section 1 of the Alaska Constitution provides that "[t]he people may propose and enact laws by the initiative."  This initiative power is not limitless, however, and article XI, section 7 expressly restricts the use of the initiative.  One such

---

[6]     *See* Alaska Const. art. XI, § 7 ("The initiative shall not be used to . . . enact local or special legislation.").

[7]     *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1072 (Alaska 2009) (citing *Anchorage Citizens for Taxi Reform v. Municipality of Anchorage*, 151 P.3d 418, 422 (Alaska 2006)).

[8]     *Id*. (citing *Anchorage Citizens for Taxi Reform*, 151 P.3d at 422).

[9]     *Id*. at 1072 (citing *Staudenmaier v. Municipality of Anchorage*, 139 P.3d 1259, 1261 (Alaska 2006)).

restriction is that "[t]he initiative shall not be used to . . . make or repeal appropriations."[10] Although "[w]e 'construe voter initiatives broadly so as to preserve them whenever possible . . .' [a]nd 'we liberally construe constitutional and statutory provisions that apply to the initiative process,' "[11] we "careful[ly] consider[]" "whether an initiative complies with article XI, section 7's limits."[12]

In the initiative context, we have construed the term "appropriation" broadly, looking to the intentions of the delegates at the Alaska Constitutional Convention for interpretive guidance.[13] We have concluded that the delegates had "two core objectives" in mind when they drafted the prohibition on appropriation by initiative: "(1) 'to prevent give-away programs that appeal to the self-interest of voters and endanger the state treasury,' and (2) 'to preserve legislative discretion by ensur[ing] that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs.' "[14] By focusing our inquiry on these two core objectives, we have concluded that nonmonetary state assets, such as land and fish, may be the subjects of appropriations.[15]

---

[10] Alaska Const. art. XI, § 7.

[11] *Hughes v. Treadwell*, 341 P.3d 1121, 1125 (Alaska 2015) (first quoting *Pebble Ltd. P'ship*, 215 P.3d at 1072, then quoting *Kodiak Island Borough v. Mahoney*, 71 P.3d 896, 898 (Alaska 2003)).

[12] *Id*.

[13] *See Thomas v. Bailey*, 595 P.2d 1, 4-8 (Alaska 1979).

[14] *Hughes*, 341 P.3d at 1126 (alteration in original) (emphasis in original) (quoting *Pebble Ltd. P'ship*, 215 P.3d at 1074-75).

[15] *See Pullen v. Ulmer*, 923 P.2d 54, 64 (Alaska 1996) (holding that proposed initiative allocating salmon species to noncommercial fishers at expense of commercial
(continued...)

With these considerations in mind, "[w]e employ a two-part inquiry to determine whether an initiative makes an appropriation of state assets . . . . First we must determine 'whether the initiative deals with a public asset.' Second, if the initiative deals with a public asset, then we must determine 'whether the initiative would appropriate that asset.' "[16] To answer the second question, we evaluate whether the proposed initiative would violate either of the core objectives of the prohibition on appropriations by initiative.[17] If we determine that an initiative is either a give-away program or a restriction on the legislature's ability to allocate state assets among competing needs, then we will hold the initiative to be a prohibited appropriation.

The sponsors argue that in *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, we defined "appropriation" in the article XI, section 7 context to mean the "set[ting] aside [of] a certain specified amount of money or property for a specific purpose or object in such a manner that is executable, mandatory, and reasonably definite with no further legislative action."[18] They claim that this court does not need to evaluate the two core objectives if an initiative does not meet this definition of appropriation.

The *City of Fairbanks* discussion related to defining appropriations in the context of an initiative seeking to repeal a municipal code section that "arguably"

---

[15]    (...continued)
fishers would effect a prohibited appropriation); *Bailey*, 595 P.2d at 8-9 (holding that proposed initiative granting state land to state citizens would effect a prohibited appropriation).

[16]    *Hughes*, 341 P.3d at 1125 (quoting *Pebble Ltd. P'ship*, 215 P.3d at 1073).

[17]    *Id*. at 1126.

[18]    *See* 818 P.2d 1153, 1157 (Alaska 1991). They also cite *Thomas v. Rosen*, 569 P.2d 793 (Alaska 1977), for a similar proposition. But *Thomas* did not address appropriations in the context of article XI, section 7, and did not "purport[] to offer a general definition of appropriations." *Bailey*, 595 P.2d at 5 n.21.

constituted an appropriation of tax revenues.[19] We defined "appropriation" as *part* of our analysis of the two core objectives, not as a prerequisite for that analysis.[20] In *Pullen v. Ulmer* we recited the *City of Fairbanks* definition of "appropriation" as simply part of the case law from which the "two core objectives . . . can be distilled."[21] In *Pebble Ltd. Partnership ex rel Pebble Mines v. Parnell* we made clear that "[when evaluating] whether the initiative would appropriate [public] assets, we look primarily to the 'two core objectives' of the constitutional prohibition against initiatives that would make an appropriation."[22] And more recently, in *Hughes*, we reiterated the primacy of the two core objectives.[23]

The parties agree that fish are a state asset that may be the subject of appropriations. As a result, the primary issue before us is whether a ban on set net fishing constitutes an appropriation of salmon away from set netters and towards other fisheries.

The Lieutenant Governor argues that *Pullen* governs this determination. *Pullen* concerned an initiative providing, in relevant part, that

> subsistence, personal use, and sport fisheries shall receive a preference to take a portion of the harvestable surplus of salmon stocks. Subsistence, personal use, and sport fisheries must be ensured of a reasonable opportunity to take enough

---

[19]      *City of Fairbanks*, 818 P.2d at 1156-57.

[20]      *See id*. ("Our prior cases defining 'appropriation' in the context of article XI, section 7 have concentrated on the two parallel purposes for preventing the making of appropriations through the initiative process.").

[21]      923 P.2d at 63.

[22]      215 P.3d 1064, 1074-75 (Alaska 2009).

[23]      *See* 341 P.3d 1121, 1126 (Alaska 2015).

salmon necessary to satisfy the harvest needs of those fisheries before other fisheries may be allocated the remaining portion of the harvestable surplus.[24]

We held that "the state's interest in salmon migrating in state and inland waters is sufficiently strong to warrant characterizing such salmon as assets of the state which may not be appropriated by initiative."[25] Further, we held that the initiative violated both core objectives of the prohibition on appropriations by initiative. We concluded that the initiative was a give-away program because "it [was] clear that the proposed initiative [was] designed to appeal to the self-interests of sport, personal[,] and subsistence fishers, in that [those] groups [were] specifically targeted to receive state assets in the circumstance of harvestable shortages."[26] And we also concluded that "the initiative [would] significantly reduce[] the legislature's and Board of Fisheries' control of and discretion over allocation decisions, particularly in the event of stock-specific or region-specific shortages of salmon between the competing needs of users."[27] We made particular note of the possibility that the proposed initiative, if approved, "could result in the closure of some commercial fisheries."[28]

The Lieutenant Governor argues that, similar to the initiative in *Pullen*, 13PCAF would be a give-away program, allocating fish away from set netters towards

---

[24]     923 P.2d at 55.

[25]     *Id*. at 61.

[26]     *Id*. at 63.

[27]     *Id*. (citing *McAlpine v. Univ. of Alaska*, 762 P.2d 81, 88-89 (Alaska 1998)). The legislature has delegated to the Board of Fisheries the authority to "allocate fishery resources among personal use, sport, guided sport, and commercial fisheries." AS 16.05.251(e).

[28]     *Pullen*, 923 P.2d at 64.

-10-                                                    7073

all other fishers. And he contends that 13PCAF would narrow the legislature's and Board of Fisheries' range of freedom in making allocation decisions by effectively prohibiting them from allocating salmon stock to set netters.

### 1.    13PCAF would be a "give-away program."

The superior court concluded that "13PCAF [would] not result in a give-away program." The court reasoned that "commercial set netters are not a 'user group' [under AS 16.05.251(e)] any more . . . than sport fishers using fly rods are a distinct user group from those using spinning rods." Relying on this reasoning, the court applied our holding in *Pebble*[29] to conclude that "[i]nitiatives that regulate public assets are not prohibited so long as the regulations do not result in the allocation of an asset entirely to one group at the expense of another."

The Lieutenant Governor argues that the court's application of *Pebble* was flawed because the court's reliance on AS 16.05.251(e)'s broad categories was misplaced. Specifically, he claims that it was error to conclude that the relevant user group was "commercial fishers" as a whole instead of the subset of commercial fishers who use set nets. He is correct. Although AS 16.05.251(e) grants the Board of Fisheries the authority to "allocate fishery resources among personal use, sport, guided sport, and commercial fisheries," the Board is not precluded from making intragroup allocations within those general categories.

Indeed, the statute's definition of "fishery" demonstrates that intragroup allocations are more than appropriate: AS 16.05.940(17) provides that " 'fishery' means a specific administrative area in which a specific fishery resource is taken *with a specific type of gear*; however, the Board of Fisheries *may* designate a fishery to include more

---

**29**    *See Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1077 (Alaska 2009).

than one specific . . . type of gear."[30] (Emphasis added.) Under this definition, a commercial set net fishery is distinct from a commercial drift net fishery, *unless* the Board of Fisheries chooses to designate them together.

The sponsors respond that "[b]ecause the Board of Fisheries is free to define a 'fishery' in a more expansive manner than 'commercial set netters,' it is not accurate to say that a regulation prohibiting commercial set nets would 'eliminate a fishery.' " This argument is unpersuasive because, regardless of the Board of Fisheries' freedom to do otherwise, the Board *does* differentiate between "set gillnet fisheries" and "drift gillnet fisheries."[31] Banning set nets would therefore, quite obviously, eliminate set net fisheries as they are currently designated by the Board. Relatedly, as amicus curiae Resources for All Alaskans points out, commercial set net permits are issued separately from drift net permits and have different monetary values.[32] As a result, commercial set netters affected by 13PCAF could not immediately or easily transition to other forms of commercial fishing. Not only would they need to obtain the necessary gear, they would also need to obtain the necessary permits to operate in the separate

---

[30]     *See also* AS 16.43.990(4) (defining "fishery" similarly for purposes of limiting entry to commercial fisheries).

[31]     *See, e.g.*, 5 Alaska Administrative Code (AAC) 21.353, .354, .358, .359, .360, .365 (2015) (establishing Board of Fisheries management plans distinguishing between commercial set gillnet and drift gillnet fisheries); *see also* 20 AAC 05.320 (establishing a Commercial Fisheries Entry Commission regulation distinguishing between set gillnet and other commercial fisheries).

[32]     20 AAC 05.245(b) ("[A] separate permit is required for each separate fishery resource, gear, and administrative area."); *see also* COMMERCIAL FISHERIES ENTRY COMM'N, *Permit Value Report Menu*, https://www.cfec.state.ak.us/ pmtvalue/mnusalm.htm (last updated Jan. 5, 2012).

fisheries, and those permits are in limited supply.[33]

Indeed, we have previously concluded that AS 16.05.251(e) governs allocations *among* different commercial fisheries as well as between the more general categories of personal use, sport, guided sport, and commercial fisheries. In *Peninsula Marketing Ass'n v. State*, we held that

> [t]he criteria listed in [AS 16.05.251(e)] are equally applicable to intra-group resource allocation as they are to inter-group allocation. *There is no basis for distinguishing allocations among commercial fisheries from allocation between different types of fisheries.* Commercial fishers in Fishery A would suffer the same loss if the board reallocated certain fish resources to commercial Fishery B that they would suffer if the [B]oard reallocated the fish to sport fishers in Fishery A. Indeed, *this court has specifically rejected a distinction between commercial-sport and commercial-commercial allocations.*[34]

And in *Alaska Fish Spotters Ass'n v. State, Department of Fish & Game* we noted that "[i]f the Board . . . allocate[s] the resource between competing subgroups of commercial uses, it must comply with AS 16.05.251(e)."[35] Thus it was error for the superior court to conclude that commercial set netters do not comprise a discrete user group. Because they do comprise a discrete user group, we must decide whether 13PCAF would be a give-away program.

The Lieutenant Governor argues that 13PCAF is no less a give-away program than the challenged initiative in *Pullen*. There we concluded that the initiative

---

[33]    *See* 20 AAC 05.320.

[34]    817 P.2d 917, 921 (Alaska 1991) (emphases added) (citing *Meier v. State, Bd. of Fisheries*, 739 P.2d 172, 174 (Alaska 1987)).

[35]    838 P.2d 798, 801 n.2 (Alaska 1992).

in question was a give-away program because it was "designed to appeal to the self-interests of sport, personal[,] and subsistence fishers, in that [those] groups [were] specifically targeted to receive state assets in the circumstance of harvestable shortages."[36] Likewise, the Lieutenant Governor contends, 13PCAF "is designed to appeal to the self-interests of majority user groups — primarily sport and personal use fishers — by making available to them the catch of a much smaller minority of commercial users." He also claims that 13PCAF would "appeal to the self-interest of [commercial] drift net fishers, who would stand to benefit from the elimination of the set net fishery in Cook Inlet."

The sponsors argue that the comparison to *Pullen* is faulty for two reasons. They first argue that 13PCAF would merely regulate a method of commercial fishing, not allocate salmon stock among fisheries. Second, they argue that unlike in *Pullen*, where it was clear which groups would benefit from the initiative, it is unknown which fisheries would benefit if 13PCAF were enacted.

The sponsors claim that 13PCAF cannot effect an appropriation because it was drafted as a regulatory measure and does not explicitly allocate salmon stock. They rely on our holding in *Pebble* that the regulation of public assets is a valid subject for initiative, but they largely ignore the significant — and relevant — caveat in that case's holding. Specifically, *Pebble* held that "the prohibition against initiatives that appropriate public assets does not extend to prohibit initiatives that regulate public assets, *so long as the regulations do not result in the allocation of an asset entirely to one group at the expense of another.*"[37]

---

[36]     *Pullen v. Ulmer*, 923 P.2d 54, 63 (Alaska 1996).

[37]     *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1077 (Alaska 2009) (emphasis added).

The sponsors appear to claim that this caveat does not apply here because 13PCAF would not allocate the asset entirely to one group, but this is an overly narrow and literal reading of *Pebble*'s holding. *Pebble* cited *Pullen* to support its holding,[38] and *Pullen* involved the allocation of fish to *three* separate groups.[39] *Pebble* expressly referenced this aspect of *Pullen* immediately after its caveat, noting that the initiative at issue in *Pullen* would "reserve a priority of wild salmon stock for personal, sport, and subsistence fisheries before allocating any stock for commercial fisheries."[40] Reading *Pebble* and *Pullen* together, an initiative may constitute an appropriation if it results in the *complete* reallocation of an asset from a significant, distinct user group.

Relatedly, the sponsors argue that it is not entirely clear which groups will benefit from 13PCAF, a factor that distinguishes it from the initiative in *Pullen*. This argument is unconvincing. As previously noted, 13PCAF would result in the allocation of salmon stock away from commercial set netters to some combination of all other fisheries in nonsubsistence areas where set net fishing is currently permitted.[41] There is a distinct possibility that all other fisheries would benefit from 13PCAF. But even if the Board of Fisheries reallocated the salmon stock unevenly, it is unlikely that any existing group (other than set netters) would have its allocation reduced as a result of 13PCAF: if the salmon stock available for allocation increases with the elimination of set net fisheries, there would be little reason for the Board to decrease any other fishery's

---

[38]     *See id*. (citing *Pullen*, 923 P.2d at 63-64).

[39]     *Pullen*, 923 P.2d at 55.

[40]     *Pebble*, 215 P.3d at 1077 (citing *Pullen*, 923 P.2d at 63-64).

[41]     Indeed, because the initiative in *Pullen* benefitted only noncommercial fishers while 13PCAF has the potential to benefit some commercial fishers as well, 13PCAF would appear to have *broader* appeal as a give-away program than the initiative in *Pullen*.

allocation.[42] As a result, all other fisheries have a fair chance of gaining from the passage of the initiative and little chance of losing from it. Therefore, like the initiative in *Pullen*, 13PCAF "tempt[s] the voter to [prefer] . . . his immediate financial welfare at the expense of vital government activities."[43]

For these reasons, we conclude that 13PCAF is a give-away program and therefore a prohibited appropriation by initiative.

### 2. 13PCAF would narrow the legislature's and Board of Fisheries' range of freedom in making allocation decisions.

The superior court concluded that 13PCAF did not narrow the legislature's and Board of Fisheries' range of freedom in making allocation decisions because the proposed initiative "does not create an express preference" for any of the general classes of fisheries listed in AS 16.05.251(e). "13PCAF does not take fish from commercial users and allocate those fish to sport users . . . [or] change the Board of Fisheries' role in the allocation among commercial, sport, and personal use fisheries . . . ." But this analysis errs for the reason discussed above: commercial set netters *are* a discrete user group, so 13PCAF's ban on set net fishing clearly narrows the legislature's and Board of Fisheries' range of freedom in making allocation decisions. If 13PCAF were enacted, then neither the legislature nor the Board would be able to allocate any salmon stock to this significant, existing user group.

### B. Alaska's "Long History Of Using Direct Legislation To Manage The Taking Of Fish And Wildlife" Does Not Save The Initiative.

The sponsors note that Alaska has a long history of using the initiative to

---

[42] 13PCAF would not alter the Board's discretion to reduce other groups' allocations, but it is difficult to see how its enactment would *lead to* such reductions.

[43] *Pullen*, 923 P.2d at 63 (alterations and omissions in original) (quoting *Thomas v. Bailey*, 595 P.2d 1, 8 (Alaska 1979)) (internal quotation marks omitted).

enact or reject regulations for managing the taking of fish and wildlife. They point out that on the same day Alaskans voted to enact the Alaska Constitution, they also voted to enact Ordinance 3, which provided that "the use of fish traps for the taking of salmon for commercial purposes is hereby prohibited in all the coastal waters of the State."[44] Since then, the sponsors note, Alaskans have voted on a variety of initiatives that would have (1) repealed the law regulating limited entry fishing; (2) altered the regulations for personal consumption of fish and wildlife; (3) prohibited the same-day airborne hunting of wolves, wolverines, foxes, and lynxes; (4) prohibited the use of snares for trapping wolves; and (5) prohibited bear baiting and feeding. The sponsors also note that in *Brooks v. Wright* we reversed the superior court's injunction against placing the wolf snare initiative on the ballot.[45] They argue that the appearance of these initiatives on the ballot demonstrates 13PCAF's constitutionality. This is incorrect.

Ordinance 3 was approved before the Alaska Constitution went into effect and was thus not governed by the constitutional prohibition against appropriating by initiative.[46] Moreover, as the Lieutenant Governor points out, the ordinance was introduced as an "emergency,"[47] "transitional"[48] measure designed to prevent the

---

[44]  Alaska Const. ord. 3, § 2.

[45]  *See* 971 P.2d 1025, 1033 (Alaska 1999).

[46]  *See* Alaska Const. ord. 3, § 2 ("If the constitution shall be adopted by the electors and if a majority of all the votes cast for and against this ordinance favor its adoption, then [the ordinance] shall become operative upon the effective date of the constitution.").

[47]  *See* Statement of Delegate Seaborn J. Buckalew, 5 Proceedings of the Alaska Constitutional Convention (PACC) 3214 (Jan. 26, 1956).

[48]  Statement of Delegate Seaborn J. Buckalew, 5 PACC 3214, 3219, 3232
(continued...)

-17-                                                                                          **7073**

continued decimation of Alaska's resources by out-of-state interests[49] before the fledgling state legislature could react.[50] There was significant discussion at the constitutional convention over whether it would be more appropriate to allow the legislature to enact the fish trap ban,[51] but the delegates ultimately voted to include the fish trap ordinance on the ballot.[52] The arguments that prevailed were (a) that it was

---

[48]    (...continued)
(Jan. 26, 1956); *accord* Statement of Delegate Victor Fischer, 5 PACC 3246 (Jan. 26, 1956).

[49]    *See* Statement of Delegate Victor C. Rivers, 5 PACC 3228 (Jan. 26, 1956) ("[I]n 1949 . . . there were 455 fish traps in Alaska. They were owned by 138 owners, practically all residents of the Pacific Northwest. At that time, they were taking between $80,000,000 and $100,000,000 a year in fish out of Alaska waters for a total catch, approximately one-half of which was caught by fish traps. They have, as we all know, seriously depleted the resource."); *see also* Statement of Delegate R.E. Robertson, 5 PACC 3231 (noting that some commercial fishers "even come up from California" and that out-of-state fishers "fish more intensely than many of our local fishermen do").

[50]    Statement of Delegate Seaborn J. Buckalew, 5 PACC 3241 (Jan. 26, 1956) ("The purpose of this ordinance . . . [is to guarantee that] the minute the President issues the proclamation [of statehood] the traps are illegal. We don't have to wait 30 days, 40 days, or six months for the legislature to get around to acting."); Statement of Delegate Victor Fischer, 5 PACC 3246 (Jan. 26, 1956) ("This provision is designed primarily to take care of the period from the time we become a state until the time that our first legislature could meet and pass the necessary legislation.").

[51]    Statement of Delegate John C. Boswell, 5 PACC 3217 (Jan. 26, 1956) ("The problem that faces us . . . is . . . whether an ordinance is a proper approach to the [fish trap] problem."). Statement of Delegate Robert J. McNealy, 5 PACC 3225 (Jan. 26, 1956) ("I still am in favor of the abolition of fish traps, but . . . I believe it is a legislative matter."); Statement of Delegate Herb Hilscher, 5 PACC 3227 (Jan. 26, 1956) ("This is a legislative matter.").

[52]    *See* 5 PACC 3591 (Jan. 30, 1956) (showing the delegates voted 38-16 against striking the fish net ordinance from the ballot).

inevitable that the state legislature would ban fish traps,[53] and (b) that action was needed as soon as Alaska achieved statehood.[54] Here, however, 13PCAF is neither an emergency nor transitional measure, and the delegates' primary considerations for allowing the voters to directly ratify Ordinance 3 do not apply to 13PCAF.

The sponsors highlight our statement in *Brooks* that "the delegates' decision to submit Ordinance 3 . . . for voter ratification along with the rest of the constitution evidences the delegates' and voters' understanding that wildlife management issues would be subject to direct democracy."[55] But the Lieutenant Governor does not claim otherwise. Instead he contends that 13PCAF does not only regulate, but also impermissibly appropriates. Moreover, the delegates' decision to subject Ordinance 3 to popular vote has more precedential force in the context of wildlife management — a policy area not expressly prohibited by article XI, section 7 of the Alaska Constitution

---

[53]    Statement of Delegate W.O. Smith, 5 PACC 3223-24 (Jan. 26, 1956) ("The people of Alaska have never made any secret of the fact that, when they achieve statehood, the traps will go."). Even some opponents of the ordinance recognized that a fish trap ban was inevitable. *See* Statement of Delegate John C. Boswell, 5 PACC 3217 (Jan. 26, 1956) ("[I]t's inconceivable to me that the first state legislature wouldn't [abolish fish traps] as a matter of course."); Statement of Delegate Robert J. McNealy, 5 PACC 3224-25 (Jan. 26, 1956) ("I can't imagine any representative or senator voting against the abolition of fish traps unless he was intending to move on to Seattle right after the session was over."); Statement of Delegate Herb Hilscher, 5 PACC 3228 (Jan. 26, 1956) ("We know very well that it would be political suicide for anyone to go to that first legislature and not be in favor of the immediate elimination of fish traps.").

[54]    Statement of Delegate Jack Hinckel, 5 PACC 3213-14 (Jan. 26, 1956) ("[O]ne of the main things about [Ordinance 3] is that it is asking for [fish traps] to be gotten rid of immediately upon the acceptance of the constitution . . . to relieve economic distress . . . .").

[55]    *Brooks v. Wright*, 971 P.2d 1025, 1030 (Alaska 1999).

— than in the context of appropriations, which are expressly prohibited by that section.[56]

Regarding the subsequent initiatives the sponsors cite, the mere fact that these measures appeared on the ballot does not demonstrate their constitutionality under the appropriations clause of article XI, section 7. Two of the five cited initiatives were considered before we held that fish were a public asset that may not be appropriated by initiative.[57] While considering the same-day aerial hunting[58] and wolf snare[59] initiatives in *Brooks*, we held that natural resource management was a proper subject for legislation by initiative, but we explicitly declined to address the appropriations issue sua sponte, noting that neither party made any claims relating to the appropriations clause of article XI, section 7.[60] Nor was the bear baiting initiative[61] ever challenged as an

---

[56] *Accord Hughes v. Treadwell*, 341 P.3d 1121, 1125 (Alaska 2015) (" '[W]e liberally construe constitutional and statutory provisions that apply to the initiative process,' " but "whether an initiative complies with article XI, section 7's limits requires careful consideration." (first quoting *Kodiak Island Borough v. Mahoney*, 71 P.3d 896, 898 (Alaska 2003), then quoting *Pebble Ltd. P'ship ex rel. Pebble Mines Corp. v. Parnell*, 215 P.3d 1064, 1073 (Alaska 2009))).

[57] *See Pullen v. Ulmer*, 923 P.2d 54, 61 (Alaska 1996); STATE OF ALASKA, OFFICIAL RETURNS BY ELECTION PRECINCT: GENERAL ELECTION 47 (Nov. 2, 1982), http://www.elections.alaska.gov/results/82GENR/82genr.pdf; STATE OF ALASKA, OFFICIAL RETURNS BY ELECTION PRECINCT: GENERAL ELECTION 33 (Nov. 2, 1976), http://www.elections.alaska.gov/results/76GENR/76genr.pdf.

[58] *See* STATE OF ALASKA, DIV. OF ELECTIONS, *Prior Initiative Petition List*, 95HUNT, http://www.elections.alaska.gov/pbi_ini_status_prior_list.php (last visited Nov. 18, 2015).

[59] *See* STATE OF ALASKA, DIV. OF ELECTIONS, *Prior Initiative Petition List*, 97TRAP, http://www.elections.alaska.gov/pbi_ini_status_prior_list.php (last visited Nov. 18, 2015).

[60] *Brooks*, 971 P.2d at 1028 n.12 ("The [appropriation by initiative] question
(continued...)

unconstitutional appropriation by initiative.

Moreover, none of these initiatives targeted allocations to or away from a class as discrete as commercial set netters are. Under the Limited Entry Act and its implementing regulations,[62] commercial set netters must obtain gear-specific set net permits,[63] which are limited in number,[64] hold significant value, and may be bought and sold.[65] And unlike noncommercial hunting and fishing licenses, these set net permits carry over from year to year. This makes commercial set netters a far more cohesive, recognizable, and permanent group than individuals who hunt wolves using same-day aerial techniques or snares, or who hunt bears using baiting or feeding methods. The latter individuals must generally apply for permits and licenses annually,[66] and those who wish to participate in more heavily regulated hunts have no guarantee that they will be

---

[60]    (...continued)
is . . . not properly before us, and we do not address it here.").

[61]    *See* STATE OF ALASKA, DIV. OF ELECTIONS, *Prior Initiative Petition List*, 03BEAR, http://www.elections.alaska.gov/pbi_ini_status_prior_list.php (last visited Nov. 18, 2015).

[62]    AS 16.43.010-.990; 20 AAC 05.010-.1990.

[63]    20 AAC 05.100.

[64]    20 AAC 05.320.

[65]    *See* COMMERCIAL FISHERIES ENTRY COMM'N, *Permit Value Report Menu*, https://www.cfec.state.ak.us/pmtvalue/mnusalm.htm (last updated Jan. 5, 2012).

[66]    *See* ALASKA DEP'T OF FISH & GAME, *Fishing and Hunting License General FAQ*, http://www.adfg.alaska.gov/index.cfm?adfg=license.general (last visited Nov. 18, 2015) ("Licenses are good from the date of purchase through December 31 of the license year.").

permitted to do so in any given year.[67]

This case is governed by the holdings of *Pebble* and *Pullen*, not by the existence of ballot measures that were never challenged as unconstitutional appropriations.  Under our precedent, 13PCAF would effect an appropriation, and is constitutionally prohibited.[68]

## V.    CONCLUSION

13PCAF triggers both of the delegates' core concerns underlying the prohibition on appropriations by initiative:  the initiative would result in a give-away program of salmon stock from set netters to other types of fishers, and it would significantly narrow the legislature's and Board of Fisheries' range of freedom to make allocation decisions.  13PCAF would therefore effect a prohibited appropriation via initiative. We accordingly REVERSE the superior court's order requiring the Lieutenant Governor to certify the initiative.

---

[67]    *See* ALASKA DEP'T OF FISH & GAME, *Drawing Hunt Permits Information Overview*, http://www.adfg.alaska.gov/index.cfm?adfg=huntlicense.draw (last visited October 27, 2015) ("Drawing hunts require an application fee and are awarded by lottery.  Each year, the Alaska Department of Fish and Game . . . publishes . . . specific information containing the drawing hunt opportunities and area boundaries.").

[68]    Because we decide the case on these grounds, we do not reach amicus curiae's argument that 13PCAF would enact impermissible local or special legislation.