*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BYRON MALLOTT, LIEUTENANT GOVERNOR OF THE STATE OF ALASKA, and STATE OF ALASKA, DIVISION OF ELECTIONS, | ) ) ) ) | Supreme Court No. S-16862 |
| | ) | Superior Court No. 3AN-17-09183 CI |
| | ) | |
| Appellants, | ) | O P I N I O N |
| | ) | |
| v. | ) | No. 7274 – August 8, 2018 |
| | ) | |
| STAND FOR SALMON, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Joanne Grace, Elizabeth Bakalar, and Katherine Demarest, Assistant Attorneys General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellants. Katherine Strong and Valerie Brown, Trustees for Alaska, Anchorage, for Appellee. James E. Torgerson and Tina M. Grovier, Stoel Rives LLP, Anchorage, and Ryan P. Steen, Stoel Rives LLP, Seattle, Washington, for Amici Curiae Alaska Oil and Gas Association and Resource Development Council for Alaska, Inc. Matthew Singer and Lee C. Baxter, Holland & Knight LLP, Anchorage, for Amicus Curiae ANCSA Regional Association. Geoffrey Y. Parker, Law Office of Geoffrey Y. Parker, Anchorage, for Amici Curiae Bristol Bay Fishermen's Association and Ekwok Village Council. Eric

B. Fjelstad, James N. Leik, and Elena M. Romerdahl, Perkins Coie LLP, Anchorage, for Amicus Curiae Council of Alaska Producers.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

PER CURIAM
WINFREE, Justice, dissenting in part.

## I.	INTRODUCTION

The Lieutenant Governor declined to certify a proposed ballot initiative that would establish a permitting requirement for activities that could harm anadromous fish habitat, reasoning that the initiative effected an appropriation of state assets in violation of article XI, section 7 of the Alaska Constitution. The initiative sponsors filed suit, and the superior court approved the initiative, concluding that the proposal would not impermissibly restrict legislative discretion. We conclude that the initiative would encroach on the discretion over allocation decisions delegated to the Alaska Department of Fish and Game by the legislature, and that the initiative as written therefore effects an unconstitutional appropriation. But we conclude that the problematic sections may be severed from the remainder of the initiative. Accordingly, we reverse the judgment of the superior court and remand for the superior court to direct the Lieutenant Governor to sever the offending provisions but place the remainder of the initiative on the ballot.

## II.	BACKGROUND

### A.	Facts

In May 2017 the directors of the Alaska-based nonprofit organization Stand for Salmon (the Sponsors) submitted an application for an initiative entitled "An Act providing for protection of wild salmon and fish and wildlife habitat," which the Division of Elections denominated "17FSHB." After reviewing 17FSHB, the

Department of Law concluded that the initiative effected an appropriation in violation of article XI, section 7 of the Alaska Constitution.[1]  The Department found that the initiative would restrict the legislature's ability to allocate anadromous[2] fish habitat among competing uses by "outright prohibit[ing] the use of anadromous waters for certain development purposes."  The Department thus informed the Sponsors that it intended to recommend that the Lieutenant Governor deny certification of 17FSHB.

Upon receiving the Department of Law's analysis, the Sponsors withdrew 17FSHB and filed a revised version of the initiative in July, which the Division of Elections denominated "17FSH2."  Like its precursor, 17FSH2 proposes a bill that would "amend, repeal, and reenact" provisions of AS 16.05, which requires persons seeking to engage in activities that could damage certain state waters to first secure a permit from the Department of Fish and Game (ADFG).[3]  The initiative would expand this permit requirement to cover all activities that "may use, divert, obstruct, pollute, disturb or otherwise alter anadromous fish habitat."[4]  Under the proposed permitting

---

[1]      "The initiative shall not be used to . . . make or repeal appropriations . . . ." Alaska Const. art XI, § 7.

[2]      Anadromous fish, such as salmon, are those which are born in fresh water, spend most of their life at sea, and return to fresh water to spawn.  *See Species*, N. PAC. ANADROMOUS FISH COMM'N, https://npafc.org/species/ (last visited July 30, 2018).

[3]      *See* AS 16.05.871, .881 (requiring that a person obtain ADFG approval if the person "desires to construct a hydraulic project, or use, divert, obstruct, pollute, or change the natural flow or bed of a specified river, lake, or stream, or to use wheeled, tracked, or excavating equipment or log-dragging equipment in the bed of a specified river, lake, or stream").

[4]      Section 3 of the initiative (proposed AS 16.05.871(f)) defines "anadromous fish habitat" as "a naturally occurring permanent or intermittent seasonal water body, and the bed beneath, including all sloughs, backwaters, portions of the floodplain covered by
(continued...)

system, "major" permits would be required for activities with "the potential to cause significant adverse effects" to fish habitat, while "minor" permits could be issued for projects that would have little impact on such habitat.[5]

The initiative enumerates requirements that would have to be satisfied prior to issuance of a permit and establishes civil and criminal penalties for anyone who "violates or permits a violation of" the permitting scheme. Additionally, Section 2 of the initiative would add the following new section to AS 16.05:

> **Sec. 16.05.867. Fish and wildlife habitat protection standards.**
>
> (a)     The commissioner shall ensure the proper protection of fish and wildlife, including protecting anadromous fish habitat from significant adverse effects.
>
> (b)     When issuing a permit under AS 16.05.867-16.05.901, the commissioner shall ensure the proper protection of anadromous fish habitat by maintaining:
>
> (1)     water quality and water temperature necessary to support anadromous fish habitat;
>
> (2)     instream flows, the duration of flows, and natural and seasonal flow regimes;
>
> (3)     safe, timely and efficient upstream and downstream passage of anadromous and native resident fish

---

[4]     (...continued)
the mean annual flood, and adjacent riparian areas, that contribute, directly or indirectly, to the spawning, rearing, migration, or overwintering of anadromous fish." Proposed AS 16.05.871(c) establishes a presumption that state waters are anadromous fish habitat if they are connected to marine waters or to waters designated by the ADFG commissioner as anadromous fish habitat.

[5]     ADFG could also issue a "general permit" that would sanction entire classes of minimal-impact activities within a particular region.

species to spawning, rearing, migration, and overwintering habitat;

(4) habitat-dependent connections between anadromous fish habitat including surface-groundwater connections;

(5) stream, river and lake bank and bed stability;

(6) aquatic habitat diversity, productivity, stability and function;

(7) riparian areas that support adjacent fish and wildlife habitat; and

(8) any additional criteria, consistent with the requirements of AS 16.05.867-AS 16.05.901, adopted by the commissioner by regulation.

(c) The commissioner is authorized, in accordance with AS 44.62, to adopt regulations consistent with AS 16.05.867-16.05.901. All regulations, administrative actions and other duties carried out under this chapter shall be consistent with and in furtherance of the standards set out in this section.

The initiative also enumerates certain circumstances in which a permit "may not be granted." Section 7 of the initiative would add a new section to AS 16.05 that reads in part:

**Sec. 16.05.887. Permit conditions and mitigation measures.**

(a) The commissioner shall prevent or minimize significant adverse effects to anadromous fish habitat. . . . [A]n anadromous fish habitat permit may not be granted for an activity that will:

(1) cause *substantial damage*[6] to anadromous fish habitat under AS 16.05.877(b);

---

[6] Emphasis added.

(2)    fail to ensure the proper protection of fish and wildlife;

(3)    store or dispose of mining waste, including overburden, waste rock, and tailings in a way that could result in the release or discharge of sulfuric acid, other acids, dissolved metals, toxic pollutants, or other compounds that will adversely affect, directly or indirectly, anadromous fish habitat, fish, or wildlife species that depend on anadromous fish habitat;

(4)    replace or supplement, in full or in part, a wild fish population with a hatchery-dependent fish population;

(5)    withdraw water from anadromous fish habitat in an amount that will adversely affect anadromous fish habitat, fish, or wildlife species; or

(6)    dewater and relocate a stream or river if the relocation does not provide for fish passage or will adversely affect anadromous fish habitat, fish, or wildlife species.

Mirroring the first subsection quoted above, the major permitting scheme outlined in Section 6 of the initiative includes the following provision:

**Sec. 16.05.885.  Major anadromous fish habitat permit.**

. . . .

(e)    The commissioner may issue a major permit to an applicant only if:

. . . .

(3)    the activity, as authorized by the written permit determination, will not cause *substantial damage*[7] to anadromous fish habitat under AS 16.05.877(b) . . . .

Section 5 of the initiative (proposed AS 16.05.877(b)) would require ADFG when evaluating a proposed activity to find that it will cause "substantial damage" to

---

[7]    Emphasis added.

anadromous fish habitat — thus precluding that activity from receiving a permit — when:

> [D]espite the application of scientifically proven, peer reviewed and accepted mitigation measures under AS 16.05.887, the anadromous fish habitat will be adversely affected such that it will not likely recover or be restored within a reasonable period to a level that sustains the water body's, or portion of the water body's, anadromous fish, other fish, and wildlife that depend on the health and productivity of that anadromous fish habitat.

The Department of Law reviewed the revised initiative and again concluded that it would effect an appropriation. It found that like 17FSHB, 17FSH2 would "effectively preclude some uses [of anadromous fish habitat] altogether," therefore "leaving insufficient discretion to the legislature to determine how to allocate those state assets." The Department thus recommended that the Lieutenant Governor decline to certify the application. Relying on the Department's analysis, the Lieutenant Governor declined to certify 17FSH2 in September 2017.

## B.   Procedural History

The Sponsors filed suit that same month challenging the Lieutenant Governor's conclusion and seeking a preliminary injunction to allow immediate circulation of the initiative for voter signatures. At the parties' request, the superior court converted the preliminary injunction motion into cross motions for summary judgment.

The Sponsors argued that "an initiative may regulate activities — even to the point where the activities may be prohibited — so long as the Legislature retains discretion in implementing the initiative's provisions." They further argued that 17FSH2 is a "permissible regulatory initiative" because "its manifest intent is to protect and preserve fish and wildlife habitat, it does not target any one use, and it retains discretion in the Legislature." The Lieutenant Governor and the Division of Elections (collectively,

the State) contended that 17FSH2 would "preclude[] the use of even a single waterway for a major development project," unconstitutionally "depriv[ing] the legislature of authority to allocate fish streams among competing uses." The State recognized that the initiative does not expressly prohibit "the alteration of streams for major development projects," but argued that a restriction of legislative discretion "need not be express to render it unconstitutional."

The superior court held oral argument on October 3, 2017. On October 9, the court issued an order granting the Sponsors' motion for summary judgment and denying the State's cross-motion. The court characterized the "central disagreement" between the parties as concerning "whether 17FSH2 is a permissible regulation or an allocation of public assets that impermissibly limits legislative discretion." Rejecting the State's argument, the court likened 17FSH2 to the initiative we upheld in *Pebble Ltd. Partnership v. Parnell,*[8] and concluded that the initiative "leaves the legislature discretion in its implementation through the use of a plethora of undefined terms." Because the court concluded that 17FSH2 is constitutionally permissible, it ordered the Lieutenant Governor to print petition booklets as required by statute.

The State appeals. Amicus briefs supporting the State's position were submitted by the Alaska Oil and Gas Association and Resource Development Council for Alaska, Inc.; by the ANCSA Regional Association; by the Bristol Bay Fishermen's Association and the Ekwok Village Council; and by the Council of Alaska Producers.[9]

## III. STANDARD OF REVIEW

We review questions of law, including the constitutionality of a ballot initiative and the meaning of the constitutional term "appropriation," using our

---

[8]     215 P.3d 1064 (Alaska 2009).

[9]     We thank amici for providing exemplary briefing to the court.

independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[10]  "When reviewing initiatives, we 'construe voter initiatives broadly so as to preserve them whenever possible.  However, initiatives touching upon the allocation of public revenues and assets require careful consideration because the constitutional right of direct legislation is limited by the Alaska Constitution.' "[11]

## IV.    DISCUSSION

### A.    The Alaska Constitution Prohibits The Use Of An Initiative To Usurp Or Encroach On The Legislature's Sole Authority To Allocate State Resources.

For more than two centuries, Alaska's economy has been centered around the development and harnessing of its natural resources, from the fur trade of the 18th and 19th Centuries and the gold rushes of the 1890s, to the growth of copper mining and commercial fishing in the early 20th Century and the oil discoveries of the 1950s and 1960s.  The need for responsible management of Alaska's natural resources to promote economic self-sufficiency in light of competing interests is reflected in article VIII, section 1 of the Alaska Constitution, which states that "[i]t is the policy of the State to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest."

---

[10]    *See Anchorage Citizens for Taxi Reform v. Municipality of Anchorage*, 151 P.3d 418, 422 (Alaska 2006) (citing *Pullen v. Ulmer*, 923 P.2d 54, 58 (Alaska 1996)); *Staudenmaier v. Municipality of Anchorage*, 139 P.3d 1259, 1261 (Alaska 2006) (citing *Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 991 (Alaska 2004)).

[11]    *All. of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1128, 1134 (Alaska 2012) (quoting *Anchorage Citizens*, 151 P.3d at 422).

The Alaska Constitution also grants Alaskans a broad right to self-government through the use of the ballot initiative to "propose and enact laws."[12] However, article XI, section 7 contains several express limitations on the power of the ballot initiative, including that "[t]he initiative shall not be used to . . . make or repeal appropriations."[13] The Alaska Constitution does not provide any definition of the term "appropriation," so it has been the duty of this court to distinguish between initiatives that permissibly regulate and those that impermissibly appropriate.

In some cases, that task has been a simple one. In *Thomas v. Bailey*, we concluded that an initiative that would transfer 30 million acres of state land to individual residents was an unconstitutional appropriation because it was exactly the type of "give-away" program the delegates at the constitutional convention wanted to prohibit.[14] We later applied the same reasoning to invalidate a ballot initiative that would require the Municipality of Anchorage to sell a municipally-owned utility worth nearly $33 million to a private non-profit organization for one dollar.[15]

But not all appropriation cases have involved this kind of blatant give-away. In *McAlpine v. University of Alaska,* we noted that "the more typical appropriation involves committing certain public assets to a particular purpose."[16] "The

---

[12]    Alaska Const. art XI, § 1.

[13]    *See also* AS 15.45.010 ("The law-making powers assigned to the legislature may be exercised by the people through the initiative. However, an initiative may not be proposed . . . to make or repeal appropriations . . . .").

[14]    595 P.2d 1, 2, 7-9 (Alaska 1979).

[15]    *Alaska Conservative Political Action Comm. v. Municipality of Anchorage*, 745 P.2d 936, 936-38 (Alaska 1987).

[16]    762 P.2d 81, 88 (Alaska 1988).

reason for prohibiting appropriations by initiative," we explained, was "to ensure that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs."[17]  On that basis, we concluded that an initiative that would establish a separate community college system and require the University of Alaska to transfer a particular amount of property to the new system was an impermissible appropriation.[18]  By contrast, in *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, we upheld an initiative that repealed a dedication of municipal bed tax revenues and set the revenues aside for the city's discretionary fund because it "[did] not reduce the [city] council's control over the appropriations process," but rather "allow[ed] the council greater discretion in appropriating funds than [did] the current law."[19]

In *Pullen v. Ulmer*, we distilled from this case law "two core objectives of the constitutional prohibition on the use of initiatives to make appropriations":  "First, the prohibition was meant to prevent an electoral majority from bestowing state assets

---

[17]    *Id.* (emphasis in original).  For purposes of an appropriation analysis, we generally treat authority over allocation decisions delegated to an executive agency or other government entity as that of the legislature.  *See id.* at 91 (University of Alaska); *see also Pebble Ltd. P'ship v. Parnell*, 215 P.3d 1064, 1077 (Alaska 2009) (Department of Environmental Conservation and Department of Natural Resources); *Pullen v. Ulmer*, 923 P.2d 54, 64 (Alaska 1996) (Board of Fisheries).

[18]    *McAlpine*, 762 P.2d at 89-91.

[19]    818 P.2d 1153, 1157 (Alaska 1991); *see also id.* at 1158-59 ("The initiative in this case does not infringe on flexibility in the budget process.  Indeed, it removes existing restraints on the city council's flexibility. . . .  By no means would the initiative restrict the power of the city council in distributing the bed tax revenues. The initiative might be better described as an 'undedication' than a dedication.").

-11-                                                    **7274**

on itself.  Second, *the prohibition was designed to preserve to the legislature the power to make decisions concerning the allocation of state assets*."[20]

These core objectives have been the foundation of our appropriation analysis.[21]  But we have occasionally explained the test for evaluating those objectives in different terms depending on the context.  In some cases we explained that an initiative effects an appropriation when it "would set aside a certain specified amount of money or property for a specific purpose or object in such a manner that it is executable, mandatory, and reasonably definite with no further legislative action."[22]  In others we explained that the "primary question" is "whether the initiative narrows the legislature's range of freedom to make allocation decisions in a manner sufficient to render the initiative an appropriation."[23]  In still others we explained that "the line between an unobjectionable initiative that deals with a public asset and one that is an impermissible appropriation is crossed 'where an initiative controls the use of public assets such that the voters essentially usurp the legislature's resource allocation role.' "[24]  These stated tests have been useful in explaining why particular initiatives amounted to impermissible

---

[20]     923 P.2d at 63 (emphasis added).

[21]     *See Lieutenant Governor v. Alaska Fisheries Conservation All., Inc.*, 363 P.3d 105, 108 (Alaska 2015); *Hughes v. Treadwell*, 341 P.3d 1121, 1126 (Alaska 2015); *All. of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1128, 1137 (Alaska 2012); *Pebble*, 215 P.3d at 1074-75; *Staudenmaier v. Municipality of Anchorage*, 139 P.3d 1259, 1261-62 (Alaska 2006); *Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 993-94 (Alaska 2004).

[22]     *Alaska Action Ctr.*, 84 P.3d at 993 (quoting *City of Fairbanks*, 818 P.2d at 1157).

[23]     *All. of Concerned Taxpayers*, 273 P.3d at 1137 (quoting *Pebble*, 215 P.3d at 1075).

[24]     *Hughes*, 341 P.3d at 1128 (quoting *Staudenmaier*, 139 P.3d at 1263).

-12-                                                    7274

appropriations, but they also obscure and distract from a focus on the core objectives of the anti-appropriations clause.

Our prior opinions repeatedly reaffirm the two core objectives by emphasizing the importance of preserving the legislature's authority over allocation decisions. In *Pullen*, we concluded that an initiative creating an allocation preference of salmon stock to non-commercial fishers was an appropriation both because those groups were "specifically targeted to receive state assets," and because "the initiative [would] significantly reduce[] the legislature's and Board of Fisheries' control of and discretion over allocation decisions."[25] In *Staudenmaier v. Municipality of Anchorage*, citing the "two parallel purposes" of the anti-appropriations clause, we found unconstitutional an initiative that would have forced the Municipality to sell a municipal electric utility within one year.[26] And in *Alliance of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, we held that an initiative that required prior voter approval for all Borough capital projects with a total cost of more than one million dollars was an impermissible appropriation: we reasoned that "the voters' ability to veto a capital project, even prior to budget approval, infringes on the assembly's ability to allocate resources among competing uses because there is nothing that the assembly can do to appropriate money for that project."[27] Most recently, in *Lieutenant Governor v. Alaska Fisheries Conservation Alliance, Inc.*, we held that a ballot initiative that would have banned commercial set net fishing in nonsubsistence areas was a prohibited appropriation.[28] We did so both because the initiative would be a "give-away program" benefitting all

---

[25]    923 P.2d at 63.

[26]    139 P.3d at 1260-63.

[27]    273 P.3d at 1138.

[28]    363 P.3d 105, 115 (Alaska 2015).

fisheries except commercial set netters and because it would "narrow the legislature's and Board of Fisheries' range of freedom in making allocation decisions" so that "neither the legislature nor the Board would be able to allocate any salmon stock to [commercial set netters]."[29]

When determining whether an initiative effects an appropriation, the proper analysis should focus on the two core objectives we have identified. An initiative is an impermissible give-away program if it transfers state assets into private hands.[30] An initiative also effects an appropriation if it infringes on the legislature's ability to allocate resources among competing uses — that is, if it fails "to ensure that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs"[31] — by forcing the legislature to make a particular allocation decision in the future[32] or by removing certain allocation decisions from the legislature's range of discretion.[33]

---

[29]     *Id.* at 110-12.

[30]     *See Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 993-94 (Alaska 2004); *McAlpine v. Univ. of Alaska*, 762 P.2d 81, 88-89 (Alaska 1988); *Alaska Conservative Political Action Comm. v. Municipality of Anchorage*, 745 P.2d 936, 938 (Alaska 1987); *Thomas v. Bailey*, 595 P.2d 1, 7-8 (Alaska 1979).

[31]     *McAlpine*, 762 P.2d at 88 (emphasis in original).

[32]     *E.g.*, *Pullen v. Ulmer*, 923 P.2d 54, 63 (Alaska 1996).

[33]     *E.g.*, *All. of Concerned Taxpayers, Inc. v. Kenai Peninsula Borough*, 273 P.3d 1128, 1138 (Alaska 2012); *see also Alaska Action Ctr.*, 84 P.3d at 994-95 ("[B]y limiting the mechanism for future change to another initiative process, the initiative's dedication requirement necessarily intrudes on the legislature's control over future designation.").

**B.     17FSH2 Makes An Impermissible Appropriation Because It Explicitly Bars ADFG From Making Certain Allocation Decisions.**

With our prior case law in mind, it is clear that 17FSH2 narrows the legislature's range of discretion to make decisions regarding how to allocate Alaska's lakes, streams, and rivers among competing needs. Under both the current law and the permitting scheme created by 17FSH2, the ADFG commissioner is charged with managing the responsible use of waterways and fish habitat. But 17FSH2 contains two provisions that explicitly restrict the commissioner's discretion to make allocation decisions.

Proposed AS 16.05.885(e)(3) provides that the commissioner "may issue a major permit to an applicant only if . . . the activity, as authorized by the written permit determination, will not cause substantial damage to anadromous fish habitat." Proposed AS 16.05.877(b) also explicitly directs the commissioner to find that an activity does cause "substantial damage" if

> despite the application of scientifically proven, peer reviewed and accepted mitigation measures . . . the anadromous fish habitat will be adversely affected such that it will not likely recover or be restored within a reasonable period to a level that sustains the water body's, or portion of the water body's, anadromous fish, other fish, and wildlife that depend on the health and productivity of that anadromous fish habitat.

The Sponsors argue that because this provision contains a number of undefined terms — such as "adverse effects," "likely," and "reasonable period" — it leaves ADFG and the legislature interpretive discretion and therefore discretion to make allocation decisions as they see fit. But where a project like a mine or hydroelectric dam would permanently, and perhaps irreversibly, displace fish habitat, there is no reasonable interpretation under which that habitat would not suffer "substantial damage" as the initiative defines it. If

the habitat has been permanently displaced, it cannot be "likely" for that habitat to be restored within a "reasonable period," because it never will be restored.

Similarly, proposed AS 16.05.887(a) provides in relevant part that "an anadromous fish habitat permit may not be granted" for activities that would affect fish habitats in various specific ways listed in six subsections. The parties dispute how to interpret particular subsections, but in each case, it is apparent that there will be some activities that cannot by any reasonable interpretation of the initiative's language be excluded from this prohibition.

To be clear, these provisions are not problematic because they are too clearly defined; rather, they are problematic because — however they are interpreted — they bar the commissioner from granting a permit to a project that would "cause substantial damage" or have one of the listed effects, even if in the commissioner's — or the legislature's — considered judgment the public benefits of that particular project outweigh its effects on fish habitat. By doing so, the initiative "encroaches on the legislative branch's exclusive 'control over the allocation of state assets among competing needs' "[34] by removing certain allocation decisions from the legislature's range of discretion.

Although 17FSH2 indeed contains a "plethora of undefined terms," as the superior court put it, that would give the legislature and ADFG some discretion in how to implement the initiative, this only goes so far. The undefined terms give the legislature the interpretive discretion to decide how much allocation discretion the initiative takes away, but under any reasonable interpretation, the initiative would place at least some projects outside the commissioner's discretion to permit. The legislature's

---

[34]  *Alaska Action Ctr.*, 84 P.3d at 994 (quoting *Pullen*, 923 P.2d at 63).

discretion to interpret the initiative's provisions might affect the severity, but not the fact, of the initiative's infringement on the legislature's authority over allocation decisions.

**C. Our Appropriation Analysis In *Pebble Ltd. Partnership v. Parnell* Was Dictum And Is Neither Binding Precedent Nor Persuasive.**

We recognize that our decision in this case may seem at odds with our prior decision in *Pebble Ltd. Partnership v. Parnell*.[35] The initiative in that case would have prohibited any permits or authorizations for a "large scale metallic operation" that would release toxic pollutants in an amount that would "effect [sic] human health or welfare or any stage of the life cycle of salmon."[36] The case presented two questions: how to interpret the initiative, and whether the initiative would constitute an appropriation. The superior court construed the word "effect" as used in the initiative to mean "adversely affect" to avoid the implication that the initiative would also prohibit beneficial and neutral effects; we did the same.[37] We then concluded that although the *Pebble* initiative would have restricted the legislature from allowing projects that adversely affected public waters,[38] that did not constitute an appropriation because the initiative would "leave[] to the legislature, the Department of Environmental Conservation, and the Department of Natural Resources the discretion to determine what amounts of specific toxic pollutants may or may not be discharged."[39] But the entirety of our appropriations discussion in *Pebble*—beyond interpreting the initiative's language—was unnecessary

---

[35]     215 P.3d 1064 (Alaska 2009).

[36]     *Id.* at 1069.

[37]     *Id.* at 1076-77.

[38]     *See id.* at 1077 ("07WTR3 is read to *preclude* . . . discharges of toxic chemicals and other mine waste that cause 'adverse effects.' " (emphasis added)).

[39]     *Id.*

because the parties to the case agreed that, as interpreted, the initiative would not constitute an appropriation.[40] In the absence of an actual dispute, our discussion was therefore dictum.[41] And though we may follow dicta when persuasive, *Pebble*'s reasoning is anything but.

The primary error in *Pebble* was the misapplication of *Pullen v. Ulmer*.[42] In *Pullen* we reasoned that an initiative directing the Board of Fisheries to "reserve a priority for the harvest needs of common consumptive uses for each salmon stock, to the extent that is technically possible," would be an unconstitutional appropriation because it would "call[] for an actual allocation, in the event of a shortage of a given salmon species in a given geographical region, to sport, personal use, and subsistence fisheries."[43] We reached this conclusion in part by comparing the initiative to a presumably constitutional hypothetical initiative that would "simply amend[] 'a series of general legislative criteria to add more specific ones to guide the Board of Fisheries

---

[40]    *See id.* ("All of the parties agree that if section two of 07WTR3 is read to preclude only discharges of toxic chemicals and other mine waste that cause 'adverse effects' to humans, salmon, and waters used for human consumption or as salmon habitat, then 07WTR3 would not make an appropriation.").

[41]    *See Scheele v. City of Anchorage*, 385 P.2d 582, 583 (Alaska 1963) ("We look upon what we said in [a previous] case . . . as obiter dictum, since it was not necessary to the decision in the case."), *superseded by statute on other grounds*, AS 09.65.070; *see also VECO, Inc. v. Rosebrock*, 970 P.2d 906, 922 (Alaska 1999) (holding statement in previous opinion not dictum because it "was necessary for our holding"); *Obiter dictum*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("A judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (although it may be considered persuasive).").

[42]    923 P.2d 54 (Alaska 1996).

[43]    *Id.* at 55, 64.

in its future allocation decisions."[44]  In *Pebble* we applied this reasoning to conclude that the initiative's prohibition on harm to public waters would not be an appropriation because it was merely adding new regulatory criteria.[45]  But this conclusion does not follow from its premise.  The whole point of *Pullen*'s comparing the initiative to hypothetical criteria was that the hypothetical criteria would *not* restrict the legislature's ultimate resource allocation freedom.[46]  We made it clear in *Pullen* that we could *not* interpret the initiative as permissible guiding criteria precisely *because* the initiative would "call[] for an actual allocation, in the event of a shortage of a given salmon species in a given geographical region, to sport, personal use, and subsistence fisheries."[47]  But the *Pebble* initiative sought to do precisely that, in the inverse, by forbidding the legislature from allocating any assets to projects that "adversely affect[ed]" public waters.[48]  By doing so, the *Pebble* initiative crossed the line from permissible guiding criteria, where ultimate discretion is retained by the legislature, to impermissible appropriation, where the legislature is forbidden from using specific public assets for specific purposes.  It was therefore wrong to rely on *Pullen* to characterize a complete prohibition on certain uses of public assets as a permissible initiative.

---

[44]  *Id.*

[45]  215 P.3d at 1077.

[46]  *See Pullen*, 923 P.2d at 64 n.15 ("[W]here the legislature retains a broad range of freedom to make allocation decisions, an appropriation will not be found.  Under the current initiative, in cases of shortage — which is when the initiative operates — such freedom is not retained.").

[47]  *Id.* at 64.

[48]  *See* 215 P.3d at 1077.

It was also wrong in *Pebble* to rely on new legal standards for so-called "regulatory" initiatives. We stated in *Pebble* that "the legislative history of the drafting of the Alaska Constitution and the language of the constitution itself 'evidences the delegates' intent that natural resource issues would be subject to the initiative.' "[49] We quoted *Brooks v. Wright*[50] for this proposition, and then announced that "the prohibition against initiatives that appropriate public assets does not extend to prohibit initiatives that *regulate* public assets, so long as the regulations do not result in the allocation of an asset entirely to one group at the expense of another."[51] We applied this rule to conclude that the *Pebble* initiative would not be an appropriation because it would "prohibit[] harm to public assets while permitting the use of public assets and exhibiting no explicit preference among potential users."[52] The legal foundations of this analysis are shaky at best; there is little to no basis in our case law, and certainly none in the constitution, for distinguishing between "regulatory" initiatives and other initiatives. And the reasoning provided in defense of the distinction is not persuasive.

First, in *Brooks* we were deciding only whether the initiative process was "clearly inapplicable" to natural resource issues, and we did not address whether the initiative in that case (which would have banned the use of snares for trapping wolves)

---

[49]   *Id.* (quoting *Brooks v. Wright*, 971 P.2d 1025, 1029 (Alaska 1999)).

[50]   971 P.2d 1025 (Alaska 1999).

[51]   *Pebble*, 215 P.3d at 1077 (emphasis added).

[52]   *Id.*

was an appropriation.[53]  And we recently have recognized that past initiatives that purported to "manage" natural resources — including the initiative at issue in *Brooks* — may in fact have effected or sought to effect unconstitutional appropriations.[54]  Second, the rationale that a regulatory initiative is not an appropriation when it "prohibits harm to public assets" is wholly unpersuasive.[55]  As this case shows, an initiative that does nothing but "prohibit harm" can result in the complete lock-up of a public resource for a minimum of two years.[56]  Third, any initiative dealing with natural resources can plausibly be characterized as "regulating" them, so drawing a dividing line between regulatory initiatives and other types of initiatives seems not only difficult, but ultimately futile.  We therefore were wrong in *Pebble* to say that the initiative would not be an appropriation simply because it regulated natural resources.

We also were incorrect to reason that the *Pebble* initiative would not be an appropriation because it did not allocate public assets to or from a user group.  We announced in *Pebble* that "the prohibition against initiatives that appropriate public assets does not extend to prohibit initiatives that regulate public assets, so long as the regulations do not result in the allocation of an asset entirely to one group at the expense

---

[53]  *See* 971 P.2d at 1028 & n.12 ("At no stage of this case has any party argued that the wolf snare initiative makes or repeals an appropriation in violation of Article XI, § 7.").

[54]  *See Lieutenant Governor v. Alaska Fisheries Conservation All., Inc.*, 363 P.3d 105, 112-15 (Alaska 2015) (explaining that Alaska's long history of natural resource management by initiative does not demonstrate that such initiatives are permissible under the appropriations restriction).

[55]  *See Pebble*, 215 P.3d at 1077.

[56]  *See* Alaska Const. Art. XI, § 6 ("[An initiative] may not be repealed by the legislature within two years of its effective date.  It may be amended at any time.").

of another."[57]   We then had to clarify this rule in *Lieutenant Governor v. Alaska Fisheries Conservation Alliance, Inc.* by explaining that an initiative is not permissible merely because it redistributes assets from *one user group* to *many diffuse users*, as an "overly narrow and literal reading" of *Pebble* would suggest.[58]  We instead stated a rule that "an initiative may constitute an appropriation if it results in the *complete* reallocation of an asset *from a significant, distinct user group*."[59]  This "user group" analysis is untethered from the constitution and our analysis of the two core objectives.  It focuses on identifying a "significant, distinct user group" and asking whether an initiative would allocate assets "completely" to or from that group.  The framework thus improperly shifts our focus from evaluating the legislature's ability to allocate and manage public assets as it deems fit to defining relevant user groups and evaluating the legislature's ability to allocate public assets to these user groups.  For instance, if an initiative completely eliminated the legislature's ability to allocate assets to large mining projects, but not to small mining projects, *Pebble*'s constitutional analysis would turn on whether "mining projects" or "large mining projects" constitute the relevant user group.  But either way the initiative would compromise the legislature's resource-allocation prerogative, so any such analysis is beside the point.[60]

---

[57]     215 P.3d at 1077.

[58]     363 P.3d at 111.

[59]     *Id.* at 112 (first emphasis in original, second emphasis added).

[60]     We reiterated the user group test to decide *Alaska Fisheries*, so our user group analysis in that case is not dictum.  *See id.* at 110-12.  But *Alaska Fisheries* makes clear that the user group test is not outcome determinative.  *See id.* at 112 ("[A]n initiative *may* constitute an appropriation if it results in the complete reallocation of an asset from a significant, distinct user group." (emphasis added, original emphasis removed)).  In any event, we could have reached the same result in *Alaska Fisheries* by

(continued...)

Finally, in *Pebble* we should not have characterized legislative "discretion" as dependent on undefined terms. We centered our appropriations inquiry in *Pebble* on the extent to which the initiative would restrict legislative discretion, explaining: "The primary question before us, therefore, is whether the initiative narrows the legislature's range of freedom to make allocation decisions in a manner sufficient to render the initiative an appropriation."[61] We then said that the initiative would "leave[] to the legislature . . . the discretion to determine what amounts of specific toxic pollutants may or may not be discharged at a mining site."[62] This reasoning suggested that the legislature retained discretion because it could define "adversely affect" as it preferred. But the legislative "discretion" to define terms is not the discretion mandated by the constitution, which vests *all* appropriation power in the legislature.[63] The legislature does not truly retain control over public assets if the voters may forbid it from using those assets in a particular manner; such a restriction on the legislature's allocation freedom cannot be characterized as "simply amending 'a series of general legislative criteria to add more specific ones to guide the [legislature] in its future allocation

---

[60]     (...continued)
a different theory because the legislature, through Alaska statutes and regulations, had *already* allocated public assets to set net fishers, *id.* at 110-11, so the proposed initiative's ban on set net fishing in that case was also an unconstitutional *repeal* of an appropriation. *See* Alaska Const. Art. XI, § 7 ("The initiative shall not be used to . . . make *or repeal* appropriations . . . ." (emphasis added)).

[61]     215 P.3d at 1075.

[62]     *Id.* at 1077.

[63]     *See McAlpine v. Univ. of Alaska*, 762 P.2d 81, 88 (Alaska 1988) ("The reason for prohibiting appropriations by initiative is to ensure that the legislature, and *only* the legislature, retains control over the allocation of state assets among competing needs." (emphasis in original)).

decisions.' "[64] We were therefore wrong in *Pebble* to conclude that the legislature retained sufficient "discretion" simply because the initiative contained some undefined terms.

To follow *Pebble* to its logical conclusion would be to allow any initiative regulating public assets to go before the voters so long as it would not *wholly* usurp the legislature's allocation function. But that is not where the delegates intended to draw the line between permissible regulation and impermissible appropriation. Instead, an initiative must leave to the legislature ultimate decision-making authority to use specific public assets for specific purposes. Because 17FSH2 would completely prevent the legislature from permitting projects that result in the permanent destruction of anadromous fish habitat, the initiative constitutes an unconstitutional appropriation as written.

### D. The Offending Provisions Of 17FSH2 Can Be Severed, Preserving the Remainder Of The Initiative To Go Before The Voters.

Although we conclude that 17FSH2 as written is unconstitutional, that is not the end of the analysis. Rather than simply invalidating the entire initiative by reversing the superior court's decision and upholding that of the Lieutenant Governor, we must evaluate whether the offending provisions can be severed from the initiative.[65]

---

[64] *Pullen v. Ulmer*, 923 P.2d 54, 64 (Alaska 1996); *see also id.* at 64 n.15 ("[W]here the legislature retains a broad range of freedom to make allocation decisions, an appropriation will not be found. Under the current initiative, in cases of shortage — which is when the initiative operates — such freedom is not retained.").

[65] *See McAlpine*, 762 P.2d at 94 ("[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid." (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984))).

We have held that impermissible portions of an initiative can be excised, and the remainder validated, where each of three factors are met:

> (1) standing alone, the remainder of the proposed bill can be given legal effect; (2) deleting the impermissible portion would not substantially change the spirit of the measure; and (3) it is evident from the content of the measure and the circumstances surrounding its proposal that the sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety.[66]

---

[66] *Id.* at 94-95 (footnotes omitted); *see also Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 995 (Alaska 2004).

In this case, the offending provisions are proposed AS 16.05.885(e)(3)[67] and the third sentence of proposed AS 16.05.887(a) — from the word "Notwithstanding" to the end of subsection (a).[68] Without these provisions, the initiative no longer contains an explicit

---

[67] Proposed AS 16.05.885(e) is reproduced here, with the offending language highlighted in bold text:

The commissioner may issue a major permit to an applicant only if:

(1) the public notice period required under (c) of this section is complete;

(2) any permit conditions and mitigation measures under AS 16.05.887 are mandatory and enforceable;

**(3) the activity, as authorized by the written permit determination, will not cause substantial damage to anadromous fish habitat under AS 16.05.877(b);**

(4) the applicant, if required, provides the bond required by (g) of this section; and

(5) a request for reconsideration of the commissioner's final assessment and written determination under (d) of this section is not timely received under AS 16.05.889.

[68] Proposed AS 16.05.887(a) is reproduced here, again with the offending language highlighted in bold text:

The commissioner shall prevent or minimize significant adverse effects to anadromous fish habitat. The commissioner shall require a permittee under AS 16.05.885 to implement the permitted activity in a manner that avoids significant adverse effects to anadromous fish habitat or, if significant adverse effects cannot be avoided, to mitigate significant adverse effects to fish and wildlife including anadromous fish habitat under (b) of this section. **Notwithstanding (b) of this section, an anadromous fish**

(continued...)

-26- 7274

bar to granting permits with specific effects; it would still be within the commissioner's discretion to grant such permits where doing so is deemed appropriate, thus preserving the legislature's power to make decisions concerning the allocation of state assets.

**1.   Only the provisions explicitly prohibiting certain permitting decisions need to be severed.**

The State asserts that even without the provisions explicitly barring the commissioner from granting permits to projects that would cause "substantial damage,"

---

[68]   (...continued)
**habitat permit may not be granted for an activity that will:**

**(1)   cause substantial damage to anadromous fish habitat under AS 16.05.877(b);**

**(2)   fail to ensure the proper protection of fish and wildlife;**

**(3)   store or dispose of mining waste, including overburden, waste rock, and tailings in a way that could result in the release or discharge of sulfuric acid, other acids, dissolved metals, toxic pollutants, or other compounds that will adversely affect, directly or indirectly, anadromous fish habitat, fish, or wildlife species that depend on anadromous fish habitat;**

**(4)   replace or supplement, in full or in part, a wild fish population with a hatchery-dependent fish population;**

**(5)   withdraw water from anadromous fish habitat in an amount that will adversely affect anadromous fish habitat, fish, or wildlife species; or**

**(6)   dewater and relocate a stream or river if the relocation does not provide for fish passage or will adversely affect anadromous fish habitat, fish, or wildlife species.**

other provisions of the initiative would still prohibit the same projects. For example, the State argues that the framework for mitigation conditions in proposed AS 16.05.887(b)[69] require that "at a minimum," the affected habitat be restored and that "of course, the affected fish habitat cannot be restored when an activity would permanently displace the habitat." The State also argues that the "habitat protection standards" of proposed AS 16.05.867[70] prohibit ADFG from permitting any project that fails to "maintain" those

---

[69] Proposed AS 16.05.887(b) provides as follows:

When establishing permit conditions for an activity, the commissioner shall, in order of priority, require a permittee under AS 16.05.883 [minor permits], AS 16.05.884 [general permits], or AS 16.05.885 [major permits] to mitigate adverse effects by taking one or more of the following actions:

(1) limit adverse effects of the activity on anadromous fish habitat by changing the siting, timing, procedure, or other manageable qualities of the activity;

(2) if the adverse effects of the activity cannot be prevented under (1) of this subsection, minimize the adverse effects of the activity by limiting the degree, magnitude, duration, or implementation of the activity, including implementing protective measures or control technologies; and

(3) if the activity cannot be implemented in a manner that prevents adverse effects to anadromous fish habitat under this subsection, restore the affected anadromous fish habitat.

[70] These standards are expressed in proposed AS 16.05.867(b) as follows:

When issuing a permit under AS 16.05.867-16.05.901, the commissioner shall ensure the proper protection of anadromous fish habitat by maintaining:

(1) water quality and water temperature necessary

(continued...)

standards, and that this again acts as a complete bar to granting permits to projects that would permanently displace fish habitat.

But unlike the offending provisions discussed above, which explicitly remove certain permitting decisions from the commissioner's discretion, these remaining provisions are open to reasonable interpretation. Although they might amount to an appropriation if we interpreted them in the light most favorable to concluding that they do, "[w]hen one construction of an initiative would involve serious constitutional difficulties, that construction should be rejected if an alternative interpretation would

---

[70] (...continued)
to support anadromous fish habitat;

(2) instream flows, the duration of flows, and natural and seasonal flow regimes;

(3) safe, timely and efficient upstream and downstream passage of anadromous and native resident fish species to spawning, rearing, migration, and overwintering habitat;

(4) habitat-dependent connections between anadromous fish habitat including surface-groundwater connections;

(5) stream, river and lake bank and bed stability;

(6) aquatic habitat diversity, productivity, stability and function;

(7) riparian areas that support adjacent fish and wildlife habitat; and

(8) any additional criteria, consistent with the requirements of AS 16.05.867-AS 16.05.901, adopted by the commissioner by regulation.

render the initiative constitutionally permissible."[71] Interpreting the initiative broadly so as to preserve it if possible,[72] it would not be unreasonable to conclude that even a project that permanently displaces habitat could "limit adverse affects of the activity on anadromous fish habitat by changing the siting, timing, procedure, or other manageable qualities of the activity," or "minimize the adverse effects of the activity by limiting the degree, magnitude, duration, or implementation of the activity, including implementing protective measures or control technologies."[73] And the habitat protection standards can

---

[71] *Pebble Ltd. Partnership v. Parnell*, 215 P.3d 1064, 1076 (Alaska 2009) (quoting *Boucher v. Engstrom*, 528 P.2d 456, 462 (Alaska 1974), *overruled on other grounds by McAlpine*, 762 P.2d at 85).

[72] *See Hughes v. Treadwell*, 341 P.3d 1121, 1125 (citing *Pebble*, 215 P.3d at 1073).

[73] For example, a proposed mine that would need to permanently displace some fish habitat to store mine waste or tailings might nonetheless be able to "limit" or "minimize" the adverse effects of the project by constructing the dump site in a manner or location that would store waste more compactly in a smaller area — thus displacing less habitat; by restricting the amount of construction- and mining-related activity that takes place near fish habitat that will not ultimately be displaced; or by taking any number of other measures that the permit applicant or the commissioner might propose.

The partial dissent concludes that the mitigation requirements would amount to an appropriation. It does so because it reads proposed AS 16.05.887(b), in light of the "if" statements that introduce subsections (b)(2) and (b)(3), as "requiring the commissioner to require permittees to restore affected habitat" where adverse effects cannot be avoided, thus forbidding the commissioner "from issuing a permit to a prospective permittee who wishes to use anadromous fish habitat for an activity that will damage the habitat to the point it cannot be restored." Partial dissent at 6-7. But the mitigation requirements of proposed AS 16.05.887(b) already apply only "if significant adverse effects cannot be avoided." *See* 17FSH2 § 7 (proposed AS 16.05.887(a)). Thus, under the interpretation adopted by the partial dissent, any permitted project that is subject to the mitigation requirement would automatically be required to "restore" the affected fish habitat under subsection (b)(3), essentially reading subsections (b)(1) and

(continued...)

reasonably be interpreted as a collective set of broad goals for the commissioner to strive for as a general matter, as opposed to discrete requirements to be strictly and individually enforced in every permitting decision.[74] But at this point, it is not necessary for us to analyze and interpret these provisions in detail, beyond noting that they are open to a range of reasonable and constitutionally permissible interpretations.

We also note that proposed AS 16.05.887(c) could be read in a way that would amount to an impermissible appropriation. This provision states:

---

[73] (...continued) (b)(2) out of the initiative entirely. For this reason, the "if" statements must instead be read so that subsections (b)(2) and (b)(3) apply if mitigation efforts under the preceding subsections could not prevent *some* adverse effects, rather than if such efforts would not *completely* prevent adverse effects. Interpreted thus, the requirement to "restore" fish habitat would only apply if it is not possible to either "limit" or "minimize" adverse effects.

[74] The partial dissent disagrees, interpreting the habitat protection standards as requiring the commissioner to "preserve" various aspects of every individual fish habitat subject to a permit application, and asking, "how could the commissioner permit a project that will destroy anadromous fish habitat and still 'preserve' that habitat according to the habitat protection standards?" Partial dissent at 4. The answer is that the habitat protection standards in 17FSH2 do not require the commissioner to "maintain" or "preserve" every listed aspect of the specific fish habitat in question, but rather to "maintain" the listed aspects of anadromous fish habitat in Alaska as a whole. And although there would be some tension between the commissioner's discretion to permit use of state waters and the commissioner's duty to maintain Alaska's anadromous fish habitat, this same tension already exists: Article VIII, section 2 of the Alaska Constitution provides that "[t]he legislature shall provide for the utilization, *development, and conservation* of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people." (Emphasis added.) *Cf. Herscher v. State, Dep't of Commerce*, 568 P.2d 996, 1005 (Alaska 1977) (explaining that "fish and game resources are permitted to be harvested, but at the same time must be conserved to avoid depletion and extinction" and noting "the balance the Board of Fish and Game is attempting to reach in harmonizing reasonable harvesting of the game resources and their conservation").

> Permit conditions and mitigation measures under this section may not offset the activity's adverse effects by restoring, establishing, enhancing, or preserving another water body, other portions of the same water body, or land.

Interpreted in isolation, this provision could be read as prohibiting the legislature from using public lands and waters for the specific purpose of mitigating the adverse effects of other projects. If interpreted this way, proposed AS 16.05.887(c) would be an appropriation for the same reason as proposed AS 16.05.885(e)(3) and 16.05.887(a), in that it would prevent the legislature from making certain decisions regarding the allocation of state resources. But this provision can also be read as a corollary to the mitigation requirement of proposed AS 16.05.887(b). Read together, proposed AS 16.05.887(c) would essentially mean that off-site mitigation measures do not satisfy this mitigation requirement, such that a permittee would have to take at least some efforts towards *on*-site mitigation of the activity's adverse effects. But it would not prohibit the legislature or the commissioner from independently allocating public lands or waters towards mitigation of the adverse environmental effects of a permitted activity. As with the habitat protection standards and the mitigation requirement itself, discussed above, it is not necessary for purposes of this case to determine exactly how to interpret proposed AS 16.05.887(c), beyond noting that it, too, is open to a range of reasonable and constitutionally permissible interpretations.[75]

Accordingly, the only provisions that need to be severed to save the initiative are those that explicitly bar certain permitting decisions: proposed AS 16.05.885(e)(3) and the third sentence of proposed AS 16.05.887(a).

---

[75] If 17FSH2 ultimately passes, there may well be future cases in which these provisions could be subject to a successful *as-applied* constitutional challenge. But we conclude that they are not facially unconstitutional.

**2.    Severing the offending provisions would be an appropriate remedy to save the initiative.**

In order for severing the offending provisions to be appropriate, we must find that "the remainder of the proposed bill can be given legal effect," that "deleting the impermissible portion would not substantially change the spirit of the measure," and that "it is evident from the content of the measure and the circumstances surrounding its proposal that the sponsors and subscribers would prefer the measure to stand as altered, rather than to be invalidated in its entirety."[76]  As guidance to when severing the appropriating provisions of an initiative is appropriate, our decisions in *McAlpine* and *Alaska Action Center, Inc. v. Municipality of Anchorage* are instructive.

In *McAlpine*, the initiative in question would have established a community college system separate from the University of Alaska.[77]  The initiative would also have required the University to transfer to the community colleges "such real and personal property as is necessary to the independent operation and maintenance of the Community College System."[78]  More specifically, however, the initiative provided that the amount of property transferred should "be commensurate with that occupied and operated by the Community Colleges on November 1, 1986."[79]  Interpreting the term "commensurate" to mean "equal," we concluded that the initiative would impermissibly appropriate state assets because it would require the transfer of a specific amount of property, meaning "[t]he only discretion the University administrators would have is to designate the

_____

[76]    *McAlpine*, 762 P.2d at 94-95; *see also Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 995 (Alaska 2004).

[77]    762 P.2d at 83.

[78]    *Id.*

[79]    *Id.*

precise articles or parcels to be transferred."[80]  However, absent the provision requiring the property transferred to be commensurate with a specific amount, we reasoned that the initiative would "leave[] the legislature with all the discretion it needs with respect to appropriations for community colleges."[81]  In other words, severing the offending provision left an enforceable initiative that would establish a community college system without infringing on the legislature's authority over allocation decisions.

By contrast, *Alaska Action Center* involved an initiative that would have designated several hundred acres of land in eastern lower Girdwood as a park, bar any use of the park for a golf course or golf-related uses, and require that any sales or leases of 61 acres of adjacent land be for fair market value.[82]  We concluded that the park designation, like the impermissible provision in *McAlpine*, would "encroach[] on the legislative branch's exclusive 'control over the allocation of state assets among competing needs.' "[83]  But unlike *McAlpine*, removing the offending provision would leave a substantially different initiative.  We reasoned that "[t]he sponsors of the initiative wanted a golf-free park in the lower Girdwood valley, but with the park designation severed, the measure would eliminate any golf use while leaving open the full range of options for other development of the land."[84]  And while it might be possible to give legal effect to the fair-market-value requirement, we reasoned that

---

[80]     *Id.* at 89-91.

[81]     *Id.* at 91.

[82]     *Alaska Action Ctr., Inc. v. Municipality of Anchorage*, 84 P.3d 989, 991 (Alaska 2004).

[83]     *Id.* at 994 (quoting *Pullen v. Ulmer*, 923 P.2d 54, 62 (Alaska 1996)).

[84]     *Id.* at 995.

"[r]educed to prescribing the procedure for selling or leasing just sixty-one acres, the initiative [as severed] bears little resemblance to the original proposal."[85]

With these examples in mind, we turn to the initiative at hand. As indicated above, preventing 17FSH2 from effecting an unconstitutional appropriation would only require severing the two provisions that explicitly bar the commissioner from making certain permitting decisions. Absent these provisions, 17FSH2 still contains a number of substantive provisions. Section 2 (proposed AS 16.05.867) sets out various habitat protection standards and authorizes the commissioner to adopt regulations consistent with those standards and with the initiative as a whole. Section 3 (repealing and reenacting AS 16.05.871) replaces the current notice-and-approval system for fish habitat protection with a permitting system. It also replaces the current scheme by which the commissioner specifies which water bodies are protected fish habitat with a presumption that most naturally occurring water bodies are protected fish habitat, subject to site-specific exceptions issued after informed review by ADFG. Section 4 (proposed AS 16.05.875) sets out the application procedure for obtaining a permit and the procedure for the commissioner to make certain factual determinations relevant to the permitting decision. Section 5 (proposed AS 16.05.877) defines certain terms and provides guidelines for the commissioner's factual determinations. Section 6 (proposed AS 16.05.883 through .885, as severed) describes the permitting scheme in more detail, distinguishing between minor permits and major permits, and between specific and general permits for minor activities, and requires that applicants for major permits file a performance bond in an amount sufficient to ensure compliance with the permit terms and any mitigation measures imposed by the commissioner as a condition of granting the

---

[85]     *Id.*

permit. Section 6 also contains various provisions relating to public notice of permitting decisions and the factual findings underlying them.

As severed, section 7 (proposed AS 16.05.887) directs the commissioner to require permittees to minimize adverse effects of their activity, but would leave the commissioner with the discretion to determine what mitigation measures would be appropriate in any particular case. Section 8 (proposed AS 16.05.889) provides procedures for interested parties to seek rehearing of permitting decisions. Section 9 (proposed AS 16.05.894) invests the commissioner with the authority to prosecute violations of the regulatory scheme by issuing violation notices, order that the violation be stopped, or order the prevention or mitigation of the violation's adverse effects. Sections 10 and 11 revise a penalty provision in the current law, AS 16.05.901, to reflect the new regulatory scheme. Section 11 also authorizes the commissioner to impose, after notice and hearing, a civil penalty not to exceed $10,000 on persons who violate or permit a violation of the regulatory scheme.

Viewed as a whole, it is apparent that even absent the specific bars to granting permits in certain situations, 17FSH2 would make Alaska's anadromous fish habitat protection statutes significantly more restrictive by enacting a comprehensive regulatory framework and permitting scheme. This is made clear by considering the necessary procedural steps to gain approval for a hypothetical large mining project that would permanently displace some river, lake, or stream.

Under current law, the person or entity proposing the project must first check whether the affected area has been specified by the commissioner as "important for the spawning, rearing, or migration of anadromous fish."[86] If the area has not been specified as such, then no notice or approval is required. If the project would affect a

---

[86] AS 16.05.871(a).

specified river, lake, or stream, the project owners must notify the commissioner of their proposed activity.[87] Upon receiving notice, the commissioner "shall approve" the project, "unless the commissioner finds the plans and specifications insufficient for the proper protection of fish and game."[88] This standard is not defined or explained in the current statute. If a plan is rejected based on a finding that it is insufficient for the protection of fish and game, the commissioner must notify the person or agency behind the project of that finding,[89] but there is no requirement that the commissioner's reasoning for granting or denying approval be made public.

By contrast, under 17FSH2, most water bodies in the state are presumed to be anadromous fish habitat and subject to the habitat protection scheme.[90] If the project owners believe an exemption is warranted because the land or water body in question does not affect anadromous fish, they may seek an exemption through a site-specific review; the commissioner may determine that a water body is not anadromous fish habitat, if such a determination is "supported by the commissioner's written finding and verifiable documentation."[91] If no exemption is granted, the applicant must not only notify the commissioner, but also must submit a permit application that includes "all information, plans and specifications necessary to assess the proposed activity's potential adverse effects on anadromous fish habitat."[92] This places on the project owners the

---

[87]    AS 16.05.871(b).

[88]    AS 16.05.871(d).

[89]    *Id.*

[90]    17FSH2 § 3 (proposed AS 16.05.871(c) & (f)).

[91]    17FSH2 § 3 (proposed AS 16.05.871(e)).

[92]    17FSH2 § 4 (proposed AS 16.05.875(a)).

burden of producing relevant information, where the current law places the burden on the commissioner to gather that information.

The commissioner must then determine "whether the proposed activity has the potential to cause significant adverse effects on anadromous fish habitat."[93] If the mining project indeed requires permanently displacing a stream, the commissioner would necessarily find such potential and therefore treat the application as one for a major permit.[94] Accordingly, the commissioner would need to prepare a draft permit assessment describing the nature of potential adverse effects, possible alternatives or modifications that would minimize such effects, any permit conditions and mitigation measures that would be required, and the amount of the performance bond necessary to ensure compliance with those conditions.[95] The draft assessment would also require the commissioner to make a determination of whether the proposed activity would "cause substantial damage to anadromous fish habitat."[96] Again, if the project involves permanently displacing fish habitat, this finding necessarily follows. The draft assessment would then be made public and would be subject to a public comment period of at least 30 days.[97] After the public comment period, the commissioner would issue a final assessment including "the reasons for the decision and the basis for concluding that the requirements of [the habitat protection statute] are met."[98] This final assessment

---

[93] 17FSH2 § 4 (proposed AS 16.05.875(b)).

[94] *See* 17FSH2 § 5 (proposed AS 16.05.877(b)).

[95] 17FSH2 § 6 (proposed AS 16.05.885(a)).

[96] 17FSH2 § 6 (proposed AS 16.05.885(a)(6)(B)).

[97] 17FSH2 § 6 (proposed AS 16.05.885(c)).

[98] 17FSH2 § 6 (proposed AS 16.05.885(d)).

would also be made public, with specific notice sent to all persons who made comments relating to the application.[99]  Over the next 30 days, any interested party might seek reconsideration of the final assessment.[100]  Only after any request for reconsideration is denied, or if no timely request is received, would the commissioner actually issue the relevant permit, and even then, only if the required performance bond has been provided.[101]

These added procedural steps and increased public scrutiny of the permitting process may well have the effect of reducing the number of permits that are given for projects that would cause "substantial damage," such as those that would permanently displace fish habitat.  But crucially, without the offending provisions identified above, the commissioner would still have discretion to grant such permits where doing so is believed to be appropriate and in the public interest.

There can be little doubt that this proposed comprehensive regulatory framework can be given legal effect, even in the absence of the severed provisions.  And unlike *Alaska Action Center*, where severing the park designation would fundamentally alter the effect of the few remaining substantive provisions, severing the offending provisions here would not substantially change the spirit of 17FSH2.  The effect of severing the bar on certain permits might be to blunt somewhat the figurative teeth of the initiative, allowing the commissioner to permit certain projects that the Sponsors would perhaps prefer to see blocked, but the remainder of the initiative would nonetheless be a substantial step in the same direction.  For this reason, it seems likely that both the Sponsors and the subscribers of 17FSH2 would prefer the measure to stand as altered,

---

[99]     *Id.*

[100]     17FSH2 § 8 (proposed AS 16.05.889).

[101]     17FSH2 § 6 (proposed AS 16.05.885(e)-(f)).

rather than to be invalidated in its entirety.[102] The appropriate remedy to the impermissible appropriation that would be effected by 17FSH2 as written is therefore to sever the two offending provisions and certify the remainder for the ballot.

## V. CONCLUSION

As written, 17FSH2 constitutes an unconstitutional appropriation, but by severing the offending provisions the constitutional problem can be remedied without substantially changing the spirit of the measure. The remainder of the initiative would not impermissibly infringe on the legislature's authority over appropriations or that delegated to ADFG, but would still establish a comprehensive regulatory framework for activities that potentially harm anadromous fish habitat. We therefore REVERSE the judgment of the superior court and REMAND for the superior court to immediately direct the Lieutenant Governor to sever proposed AS 16.05.885(e)(3) and the third sentence of proposed AS 16.05.887(a) and to place the remainder of the initiative on the ballot.

---

[102] We also note that the initiative contains an express severability clause in Section 14, which provides as follows:

> The provisions of this Act are independent and severable. If any provision of this Act is found to be invalid or unconstitutional, the remainder of this Act shall not be affected and shall be given effect to the fullest extent possible.

This is strong, if not conclusive, evidence that the proponents of 17FSH2 would prefer to see the initiative enacted as severed rather than invalidated.

WINFREE, Justice, dissenting in part.

I respectfully dissent only regarding the court's severance analysis. The court correctly concludes that an initiative may not prevent the legislature from allocating specific public assets for specific purposes.[1] But the court then fails to properly apply its analysis to 17FSH2's habitat protection standards and mitigation requirements and thus concludes that those requirements would not effect an appropriation.[2] I disagree; I conclude that, as written, any reasonable interpretation of the habitat protection standards and mitigation requirements would prevent the legislature from allocating anadromous fish habitat to projects that would substantially damage that habitat. These provisions must be severed, at least in part, to avoid creating the very appropriation that the court holds is unconstitutional.

I begin my analysis at the point where the court and I agree. The court explains that "where a project like a mine or hydroelectric dam would permanently, and perhaps irreversibly, displace fish habitat, there is no reasonable interpretation under which that habitat would not suffer 'substantial damage' as the initiative defines it."[3] The court explains further that: "If the habitat has been permanently displaced, it cannot be 'likely' for that habitat to be restored within a 'reasonable period,' because it never will."[4] The court thus concludes that 17FSH2's provisions preventing the Department of Fish and Game (ADFG) from permitting a project that would substantially damage

---

[1] Op. at 14.

[2] Op. at 28-31.

[3] Op. at 15-16.

[4] Op. at 16.

-41- 7274

anadromous fish habitat would, if enacted, effect an unconstitutional appropriation.[5]  I agree in full with this analysis.

Where the court and I diverge is with other 17FSH2 provisions that, while not explicitly prohibiting the legislature from allocating anadromous fish habitat, would have the same practical effect.  Specifically, both the habitat protection standards in proposed AS 16.05.867 and the permit conditions and mitigation requirements in proposed AS 16.05.887 effectively prevent ADFG from permitting any activity that would completely destroy that habitat.  These provisions must therefore also be severed before 17FSH2 can be presented to the voters.

My disagreement essentially is with the court's statutory interpretation; the court reaches the opposite conclusion by reasoning that "unlike the offending provisions . . ., which explicitly remove certain permitting decisions from the commissioner's discretion, these remaining provisions are open to reasonable interpretation."[6]  To this I respond:  How?  It is sophistry simply to "not[e] that [these provisions] are open to a range of reasonable and constitutionally permissible interpretations."[7]  A statute can hold only one meaning, and though we have stated that we "construe voter initiatives broadly so as to preserve them whenever possible,"[8] we must actually interpret 17FSH2's challenged provisions before we can pass on its

---

[5]     Op. at 15-17.

[6]     Op. at 28-29.

[7]     Op. at 31.

[8]     *Pullen v. Ulmer*, 923 P.2d 54, 58 (Alaska 1996) (quoting *City of Fairbanks v. Fairbanks Convention & Visitors Bureau*, 818 P.2d 1153, 1155 (Alaska 1991)).

constitutionality.[9]  Actually interpreting those provisions, I see no reasonable interpretation of the initiative's habitat protection standards and mitigation requirements that would not effect an appropriation.

The court errs first in its description of the habitat protection standards. The court concludes that these standards "can reasonably be interpreted as a collective set of broad goals for the commissioner to strive for as a general matter, as opposed to discrete requirements to be strictly and individually enforced in every permitting decision."[10] But nothing in the initiative's text suggests such an interpretation.[11]  Proposed AS 16.05.867(b) reads:  "When issuing a permit . . . the commissioner *shall* ensure the proper protection of anadromous fish habitat by *maintaining* . . . [water quality, water flow, fish passage, habitat connections, water bed stability, riparian areas, and aquatic habitat diversity, productivity, stability, and function.]" (Emphases added.)  "Shall" is

---

[9]    The court's conclusion that we do not have to interpret 17FSH2 to pass on its constitutionality is as novel as it is wrong.  How can we decide if an initiative would "make or repeal appropriations" if we do not know what the statute means? *See* Alaska Const. art. XI, § 7.  The court's response is that the habitat protection standards and mitigation requirements are not "facially unconstitutional," suggesting that these provisions are permissible so long as they can be applied in a way that would not effect an appropriation.  But the court does not evaluate the permitting restrictions — which it *does* hold are unconstitutional appropriations — under our facial challenge framework, nor does it explain why this framework is suitable for the appropriations context.  We have never used our facial challenge framework in an appropriations case before, and use of it here seems to only "obscure and distract" from our focus on the two core objectives, in contrast to the court's painstaking and commendable efforts to refocus our analysis earlier in its opinion.

[10]    Op. at 29-30.

[11]    *See City of Kenai v. Friends of Recreation Ctr., Inc.*, 129 P.3d 452, 458-59 (Alaska 2006) ("Interpretation of a statute begins with its text.").

a mandatory term in legislative drafting, meaning "is required to."[12] "Maintain" has a similarly fixed meaning, to "preserve."[13] Combining these terms, proposed AS 16.05.867(b) means "the commissioner [is required to] ensure the proper protection of anadromous fish habitat by [preserving]" various aspects of the habitat. But destruction and preservation are mutually exclusive in this context; how can the commissioner permit a project that would destroy anadromous fish habitat and still "preserve" that habitat according to the habitat protection standards?

The court's answer is that the commissioner does not actually have to preserve the permitted habitat. Under the court's view, the commissioner satisfies proposed AS 16.05.867(b) by maintaining "the listed aspects of anadromous fish habitat in Alaska as a whole."[14] This interpretation stretches the habitat protection standards' language past the breaking point. Proposed AS 16.05.867(b) explicitly tethers the habitat protection standards to permitting decisions;[15] what relevance does "water quality and water temperature" in Ketchikan have to a permitting decision in Bristol Bay? And if

---

[12]     *Petitioners for Incorporation of City & Borough of Yakutat v. Local Boundary Comm'n*, 900 P.2d 721, 724 (Alaska 1995) ("Unless the context otherwise indicates, the use of the word 'shall' denotes a mandatory intent." (quoting *Fowler v. City of Anchorage*, 583 P.2d 817, 820 (Alaska 1978))); *see also Shall*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("Has a duty to; more broadly, is required to . . . . This is the mandatory sense that drafters typically intend and that courts typically uphold."); *Shall*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("[U]sed in laws, regulations, or directives to express what is mandatory.").

[13]     *See Maintain*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("[T]o keep in a state of repair, efficiency, or validity:  preserve from failure or decline.").

[14]     Op. at 30 n.74.

[15]     Proposed AS 16.05.867(b) begins:  "When *issuing a permit* under 16.05.867-16.05.901, the commissioner shall . . . ."

the commissioner can consider habitat quality state-wide when issuing a permit for a specific location, does that effectively mean the commissioner does not even have to consider the habitat protection standards? The court's interpretation prevents proposed AS 16.05.876(b) from having any meaning whatsoever. This is surely inconsistent with the remainder of the proposed initiative; the initiative was drafted specifically to prevent the destruction of anadromous fish habitat in the area of a permitted project.[16]

The permit conditions and mitigation requirements suffer the same defect. Proposed AS 16.05.887(a) provides: "The commissioner *shall require* a permittee . . . to implement the permitted activity in a manner that *avoids* significant adverse effects to anadromous fish habitat *or, if significant adverse effects cannot be avoided*, to mitigate significant adverse effects to fish and wildlife including anadromous fish habitat under (b) of this section." (Emphases added.) This plainly mandatory language requires the commissioner to issue permits in a way that either "avoids" significant adverse effects to anadromous fish habitat, or, "if significant adverse effects cannot be avoided," that mitigates those effects according to proposed AS 16.05.887(b). Subsection (b) in turn specifies that "the commissioner *shall*, in order of priority, *require* a permittee . . . to mitigate adverse effects by taking one or more of the following actions." (Emphases added.) These actions are:

> (1)    limit adverse effects of the activity on anadromous fish habitat by changing the siting, timing, procedure, or other manageable qualities of the activity;
>
> (2)    *if the adverse effects of the activity cannot be prevented under (1) of this subsection*, minimize the adverse effects of the activity by limiting the degree, magnitude, duration, or

---

[16]    The court acknowledges this point when discussing the offsite mitigation measures in proposed AS 16.05.887(c).

implementation of the activity, including implementing protective measures or control technologies; and

(3) *if the activity cannot be implemented in a manner that prevents adverse effects to anadromous fish habitat under this subsection,* restore the affected anadromous fish habitat. (Emphases added.)

The combination of the mandatory language in proposed AS 16.05.887(b) and the "if" language in subsections (b)(2) and (b)(3) creates a tiered mitigation system in which the commissioner's first duty is to "limit" adverse effects by "changing the siting, timing, procedure, or other manageable qualities" of the permitted activity; the commissioner's second duty, if limiting alone will not prevent adverse effects, is to "minimize" adverse effects by "limiting the degree, magnitude, duration, or implementation" of the permitted activity; and the commissioner's third duty, if limiting and minimizing both will not prevent adverse effects, is to "restore" the affected habitat. Subsection (b) as a whole makes sense only if interpreted in this way; it gives meaning to the language "in order of priority," "one or more," "and," "if the adverse effects . . . cannot be prevented under (1)," and "if the activity cannot be implemented in a manner that prevents adverse effects . . . under this subsection." 17FSH2 thus *requires* the commissioner to issue permits *requiring* permittees to "restore" habitat when the adverse effects cannot be avoided or prevented by limitation or minimization.

This restoration requirement — *requiring* the commissioner to *require* permittees to restore affected habitat — is indistinguishable from 17FSH2's ban on permits for activities that cause substantial damage, which the court concludes would effect an appropriation. In either case the commissioner is forbidden from issuing a permit to a prospective permittee who wishes to use anadromous fish habitat for an activity that will damage that habitat to the point it cannot be restored. The mitigation requirements may reach this result less directly — by conditioning permits on restoration

requirements that projects could never meet, rather than by flatly prohibiting their issuance — but the effect is the same: the legislature cannot allocate anadromous fish habitat to projects that would destroy that habitat.[17]

The court's response to my analysis — that the "requirement to 'restore' [anadromous] fish habitat would . . . apply [only] if it is not possible to either 'limit' or 'minimize' adverse effects"[18] — misses the point of the court's decision. The court already has held that the restoration requirement in 17FSH2's substantial damage ban effects an appropriation.[19] Regardless whether proposed AS 16.05.887(b)(3) applies when some adverse effects cannot be prevented by subsections (b)(1) and (b)(2) — as the court concludes — or whether proposed (b)(3) applies when all adverse effects cannot be prevented by subsections (b)(1) and (b)(2) — as I conclude — *the point is that it applies*. As long as the restoration requirement can apply to a project that would permanently destroy anadromous fish habitat, it effects an appropriation.

My severance analysis therefore includes proposed AS 16.05.867 and proposed AS 16.05.887. Both provisions contain the same basic defect: their mandatory language eliminates any possible discretion to permit projects that would destroy anadromous fish habitat. There is no principled way of altering the habitat protection standards to avoid this interpretation, so proposed AS 16.05.867(b) must be invalidated in its entirety. But the permit conditions and mitigation requirements may be treated more circumspectly. If the "if" statements preceding proposed (b)(2) and (b)(3) are

---

[17]    17FSH2 provides no mechanism for waiving this requirement; proposed AS 16.05.885(e)(2) provides that the commissioner may issue a permit only if "any permit conditions and mitigation measures under AS 16.05.887 are *mandatory and enforceable*." (Emphasis added.)

[18]    Op. at 29 n.73.

[19]    Op. at 15-17.

removed, restoration is no longer mandatory; the commissioner will instead be required to require permittees to limit adverse effects, minimize adverse effects, and/*or* restore the affected habitat.[20] This leaves the commissioner the option to impose — or not impose — a restoration requirement as the commissioner sees fit, thus retaining ultimate discretion in the legislature as our Constitution requires, while maintaining the spirit of the measure as the court describes.[21]

I therefore would remand with the additional instruction that the Lieutenant Governor sever proposed AS 16.05.867(b) and the "if" statements in proposed AS 16.05.887(b)(2) and (3). I respectfully dissent to this extent.

---

[20]    Severed proposed AS 16.05.887(b) would provide:
When establishing permit conditions for an activity, the commissioner shall, in order of priority, require a permittee under AS 16.05.883, AS 16.05.884, or AS 16.05.885 to mitigate adverse effects by taking one or more of the following actions:
(1)    limit adverse effects of the activity on anadromous fish habitat by changing the siting, timing, procedure, or other manageable qualities of the activity;
(2)    ~~if the adverse effects of the activity cannot be prevented under (1) of this subsection,~~ minimize the adverse effects of the activity by limiting the degree, magnitude, duration, or implementation of the activity, including implementing protective measures or control technologies; and
(3)    *~~if the activity cannot be implemented in a manner that prevents adverse effects to anadromous fish habitat under this subsection,~~* restore the affected anadromous fish habitat.

Such language is still suggestive of a tiered mitigation system, but by its plain language would not require restoration in all cases where the permitted activity adversely affected the anadromous fish habitat and adverse effects could not be prevented by other methods.

[21]    Op. at 39.